**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IMAGE MASTERS, INC., et al.** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | **No. 10-1141** |
| | : | |
| **CHASE HOME FINANCE, et al.** | : | |
| | : | |
| | : | |

**Goldberg, J.**                                                                          **March 11, 2013**

## MEMORANDUM OPINION

This bankruptcy appeal stems from a $65 million Ponzi scheme perpetrated by Wesley Snyder through his then-existing company, Image Masters, Inc. ("Image Masters").  After the collapse of that scheme, Lynn E. Feldman, the Chapter 7 Trustee for the bankruptcy estates of Image Masters and related entities (collectively, "Debtors"), commenced two adversary proceedings in the United States Bankruptcy Court seeking to avoid and recover nearly $26 million in transfers made by the Debtors to numerous financial institutions.

Presently before the Court is the Trustee's appeal from the bankruptcy court's dismissal of the adversary complaints.  For reasons set forth below, we will affirm the bankruptcy court's judgment in part, vacate in part and remand for further proceedings.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Image Masters and the other Debtors[1] were wholly owned, controlled and operated by Wesley

---

[1] These entities included OFPM, Inc.; Mortgage Assistance Professionals, Inc.; Mortgage Assistance Professionals, Inc., II; Discovered Treasures, Inc. and DIVIDIT, Inc.

Snyder ("Snyder").  From between 1988 and September 2007, Snyder orchestrated a Ponzi scheme through Image Masters, which defrauded more than 800 homeowners and investors.

Image Masters implemented its scheme through what has been referred to as a "Wrap-Around Equity Slide Down Discount Mortgage Program."  Through this program, homeowners were induced to refinance their existing mortgages by entering into new conventional residential mortgages with various lenders.  Snyder convinced the homeowners to use the conventional mortgages to "cash out" the equity in their homes in a first closing by borrowing more money from the lenders than they needed to pay off their existing mortgages.  At a second, subsequent closing, Snyder then persuaded the homeowners to give Image Masters the excess funds from their conventional loan refinancings (what has been referred to as the "wrap amounts"), and to sign new notes and mortgages in favor of Image Masters.  The Image Masters' mortgages were in the same amount as the refinanced conventional mortgages with the lenders, but at lower interest rates and, in some cases, for shorter terms than the conventional mortgages.  (Id. at ¶¶ 7, 30-31, 33, Ex. A, at 3, 4.[2])

Pursuant to the Image Masters' mortgages, Image Masters contractually assumed responsibility for paying the homeowners' monthly mortgage payments to the lenders.  On a monthly basis, therefore, the homeowners paid Image Masters the monthly payments required under the Image Masters' mortgages, and in turn, Image Masters was obligated to pay the lenders the monthly payments owed by the homeowners under their conventional mortgages.  Neither Snyder, Image Masters, nor any of the other Debtors had a direct relationship with any lenders obligating them to

---

[2] While we primarily cite to the Chase complaint, we note that the ABN complaint raises the same relevant factual allegations, with the exception of the specific defendants and transfers at issue. (See ABN Compl.)  Further, all arguments raised by the litigants implicate both the Chase and ABN actions.

make mortgage payments. The various lenders were also not parties to any of the Image Masters' mortgages, notes or subrogation agreements. (Id. at ¶¶ 33-34, 37-38, Ex. A, at 4.)

To make the scheme appear plausible, Snyder informed the homeowners that the wrap amounts would either be: (1) used by Image Masters immediately to pay down the homeowners' conventional mortgages, or (2) invested by Image Masters, with the proceeds being used to pay the difference between what the homeowners paid Image Masters and what the homeowners were obligated to pay to the lenders on the conventional mortgages. No profits were actually earned on the wrap amounts, and Snyder did not use these funds to reduce the principal balances owed by the homeowners on the conventional mortgages. Instead, Snyder used, in part, the payments he received from new homeowners to keep preexisting homeowners' conventional mortgages current. (Id. at ¶¶ 32, 35-36.)

Snyder also used money generated from investors in his "Wrap Around Participation Program" ("the mortgage participation investors") to meet some of Image Masters' obligations to the homeowners. Through this program, Snyder persuaded individuals to invest funds with Image Masters in return for a security interest in certain Image Masters' mortgages. In reality, however, these investors were never granted valid, perfected security interests in the Image Masters' mortgages and no such security interests were ever recorded. Rather, Snyder used the funds he received to perpetuate his Ponzi scheme. (Id. at ¶¶ 36, 49-51.)

Image Masters also prepared fraudulent accounting records to reflect the interest, principal and monthly payments due to the lenders under the conventional mortgages, and the interest, principal, monthly payments and prepayments that the homeowners believed had been applied to pay the conventional mortgages. Image Masters provided each homeowner with fabricated monthly

statements that showed a reduction in his Image Masters' mortgage equal to the amount the homeowner gave to Image Masters at the second closing. The fabricated monthly statements also showed a credit for that month's mortgage payment to Image Masters plus any additional principal submitted to Image Masters by the homeowner. The homeowners never received statements from the lenders regarding their true conventional mortgage balances because Image Masters required each homeowner to sign a change of address form directing all correspondence related to the conventional mortgage be mailed directly to Image Masters. (Id. at ¶¶ 39-40, 42.)

Eventually, the Ponzi scheme collapsed when Image Masters was unable to generate income or receive new funds/investments sufficient to remain current on the homeowners' conventional mortgages with the lenders. (Id. at ¶¶ 5, 53.)

On November 9, 2007, the United States Attorney for the Middle District of Pennsylvania charged Snyder with mail fraud arising from his orchestration of this Ponzi scheme. The criminal information alleged that, of the $65.6 million received from the homeowners and investors, Snyder forwarded only $39.1 million to the lenders for payment of the conventional mortgages. Snyder pled guilty to these charges and, on July 2, 2008, was sentenced to 146 months imprisonment, and ordered to make restitution in the amount of $29,267,080. (Id. at ¶¶ 52, 54, 56-58.)

Prior to the criminal charges, on September 18, 2007, Image Masters and the other Debtors filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code. Lynn E. Feldman was appointed permanent Trustee of the Debtors' estates on November 27, 2007. (Chase Compl. ¶¶ 5-6.)

On March 16, 2009, the Trustee initiated an adversary proceeding against the following lenders: Chase Home Finance, Citimortgage, Inc., Countrywide Home Loans, Inc., Fifth Third Bank,

GMAC Mortgage Corp.,[3] Provident Funding Associates, L.P., Saxon Mortgage, Inc., Sovereign

Bancorp, Inc., Suntrust Bank, Wachovia Bank, N.A. and Wells Fargo Home Mortgage (the "Chase

action"). In her complaint, the Trustee sought to avoid and recover nearly $24 million in alleged

fraudulent transfers made by Image Masters to these lenders. Specifically, the Trustee alleged that

such transfers were avoidable as constructively fraudulent transfers under the Bankruptcy Code, 11

U.S.C. §§ 544 & 548(a)(1)(B), and the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"),

12 Pa. C.S. § 5104(a)(2), because, Image Masters did not receive reasonably equivalent value in

exchange for the transfers. The Trustee alternatively claimed that the transfers were avoidable as

"actually" fraudulent transfers under the Bankruptcy Code, 11 U.S.C. §§ 544 & 548(a)(1)(A), and

PUFTA, 12 Pa. C.S. §§ 5104(a)(1) & 5105, in that they were made with actual intent to hinder, delay

or defraud creditors of Image Masters. Finally, the Trustee asserted that the transfers that were made

within ninety days before the bankruptcy filings were also avoidable as preferential transfers under

the Bankruptcy Code, 11 U.S.C. § 547(b). (See id.)

The Chase lenders moved to dismiss the Trustee's complaint, contending that: (1) the

constructive fraud claims (Counts I, II and IV) should be dismissed pursuant to FED. R. CIV. P.

12(b)(6) because the Debtors received reasonably equivalent value for each of the challenged

transfers; (2) the actual fraud claims (Counts I and III) should be dismissed pursuant to: (i) FED. R.

CIV. P. 12(b)(6) because the complaint demonstrated the existence of a good faith defense to actual

fraud under 11 U.S.C. § 548(c), and (ii) FED. R. CIV. P. 9(b) for failure to plead the requisite

fraudulent intent with sufficient particularity; and (3) the homeowners were necessary parties under

---

[3] We note that, having been advised that Appellee GMAC Mortgage Corp. ("GMAC") filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the Southern District of New York, all proceedings against GMAC have been stayed. (See Doc. No. 47.)

FED. R. CIV. P. 19 such that failure to join them required dismissal of the complaint. (Chase Action, Dkt. No. 09-2092, Bankr. E.D. Pa., Doc. Nos. 25-42, 73.)

Following oral argument and supplemental briefing, the bankruptcy court granted the Chase lenders' motions by memorandum opinion and order dated December 17, 2009. The bankruptcy court also provided the Trustee with thirty days to amend her complaint in compliance with the court's memorandum opinion. The Trustee did not file an amended complaint, opting instead to appeal. On February 4, 2010, the bankruptcy court dismissed the action. (See id., Doc. Nos. 78-89, 93.)

While the motions to dismiss were still pending in the Chase action, the Trustee initiated a second adversary complaint on August 31, 2009 against the following defendants: ABN Amro Mortgage Group, Inc., First Horizon Home Loan Corp., Florida Capital Bank Mortgage, Loancity.com,[4] M&T Mortgage Corp., Morequity Inc., Nbank, Principal Residential Mortgage, Provident Savings Bank, National City Bank, Federal Home Loan Mortgage Corp., Federal National Mortgage Association, Wells Fargo Bank, Bank of New York and Park Granada, LLC (the "ABN action"). In her complaint, the Trustee sought to avoid and recover more than $25 million in alleged fraudulent and preferential transfers.[5] On February 2, 2010, the ABN lenders filed a joint motion to dismiss, arguing that the ABN complaint was nearly identical to the Chase complaint, and should thus be dismissed on the same grounds. On March 3, 2010, the bankruptcy court issued a consent

---

[4] We note that Loancity.com was not named as an appellee in the instant matter. Upon review of the bankruptcy court record, it appears that Loancity.com never filed a responsive pleading to the Trustee's complaint.

[5] Approximately $23 million of this money overlaps with the money sought in the Chase action. (See ABN Compl. ¶¶ 67-68.)

order, granting the motion and dismissing the action. (See ABN Action, Dkt. No. 09-2143, Bankr. E.D. Pa., Doc. Nos. 1, 35, 39.)

The Trustee filed notices of appeal with this Court on December 24, 2009, February 9, 2010 and March 10, 2010. By Order dated April 14, 2010, we consolidated the two adversary proceedings for purposes of this appeal. (Trustee's Br. 6.)

On March 2, 2012, oral argument was held on the matter. A telephone conference was later held on December 21, 2012. On January 4, 2013, at the Court's request, the parties submitted additional letter briefs. The matter is now ripe for disposition.

## II.  THE BANKRUPTCY COURT'S OPINION

In granting the motions to dismiss, the bankruptcy court decided each contention raised in favor of the Chase and ABN lenders (hereinafter, "Lenders").

Regarding the Trustee's constructive fraud counts, the bankruptcy court found that the complaints[6] failed to plausibly state an essential element of the claim—that is, that the transfers lacked reasonably equivalent value. Specifically, the bankruptcy court concluded that the complaints, their exhibits, the exhibits attached to the motions to dismiss and the Trustee's concessions during oral argument established that Image Masters received a dollar-for-dollar reduction in liability to the homeowners under the Image Masters' mortgages. In reaching this conclusion, the bankruptcy court noted that the relevant documents evidenced that: (1) Image Masters had contractually agreed with the homeowners to pay the regular monthly amounts due on

---

[6] While the bankruptcy court's opinion pertains solely to the Chase action, we note that the ABN action was dismissed on the basis that the facts and legal issues were virtually identical to those in the Chase action. Thus, the bankruptcy court necessarily adopted the same conclusion in that proceeding. (See ABN Action, Doc. No. 39.)

the conventional mortgages with the Lenders, and (2) each transfer to a Lender constituted "a disbursal to or for the benefit of the homeowner as the advance of the wrap amount, which Image Masters owed to the homeowner." In re Image Masters, Inc., 421 B.R. 164, 177-80 (Bankr. E.D. Pa. 2009).

With respect to the actual fraud counts, the bankruptcy court first concluded that a "good faith" defense was established on the face of the complaints. The court found that the complaints demonstrated that there was no relationship, contractual or otherwise, between Image Masters and any of the Lenders. Further, the bankruptcy court also rejected the Trustee's allegation that the Lenders should have known about the Ponzi scheme given that they received multiple payments from a single source, concluding that "the Trustee's allegations fail[ed] to state in any way that Defendants acted in anything other than [] good faith." Id. at 180-83.

The bankruptcy court also dismissed the actual fraud counts for failure to plead with particularity pursuant to Rule 9(b). Relying on several cases outside of this circuit, the court held that Rule 9(b) requires a plaintiff to plead "fraudulent intent with respect to each transfer sought to be avoided and [to] connect the allegations against the defendant to the debtor's scheme to defraud creditors."[7] Id. at 186. The bankruptcy court concluded that the Trustee did not satisfy this standard in that she failed to adequately allege any "badges of fraud" to demonstrate fraudulent intent, and neglected to plead a connection between the Lenders and the Ponzi scheme. It was noted that the Trustee did not allege that the Lenders were involved in, or aware of, the lending relationship between Image Masters and the homeowners; that the Lenders had a financial relationship with

---

[7] Specifically, the bankruptcy court relied on In re Carrozzella & Richardson, 286 B.R. 480 (D. Conn. 2002), In re Churchill Mortg. Inv. Corp., 256 B.R. 664 (S.D.N.Y. 2000), and In re Sharp Int'l Corp., 403 F.3d 43 (2d Cir. 2005).

Snyder, Image Masters or some other Debtor; or that the Lenders acted in some fraudulent, unlawful or wrongful manner.  Id. at 184-85.

Lastly, the bankruptcy court dismissed the complaints for failure to join the homeowners as necessary parties under Rule 19.  The bankruptcy court first determined that the homeowners had a substantial interest in the subject matter of the bankruptcy proceedings, and that disposing of the proceedings absent joinder would impair or impede their ability to protect their interests.  The bankruptcy court reasoned that, if the transfers were avoided, the Lenders "might very well assert claims against the homeowners for either or both (1) immediate payment (again) of the full amount of all avoided transfers or (2) declare defaults for non[] payment under the terms of the conventional loans."  Id. at 189.  The bankruptcy court also found that the homeowners were necessary parties because failure to join them could leave the Lenders subject to a substantial risk of incurring double or otherwise inconsistent, contradictory, and unwarranted obligations.  The bankruptcy court concluded that, given the two pending class action suits filed by certain homeowners,[8] parallel proceedings would exist involving construction of the same loan contracts, and the Lenders "could be subject to potentially different, potentially duplicative, and potentially inconsistent interpretations and determinations regarding their rights and obligations."  Id. at 189-90.

### III.  ISSUES RAISED ON APPEAL

The issues raised by the Trustee are as follows:

1.    Whether the bankruptcy court erred in dismissing the claims for constructive fraudulent transfers on the grounds that Image Masters received reasonably equivalent value in exchange for the transfers made to the Lenders;

---

[8] The purported class action suits that were filed were: Jones v. ABN AMRO Mortg. Grp., Inc. et al., Dkt. No. 07-4328 (E.D. Pa.), and Lorah v. SunTrust Mortg., Inc., Dkt. No. 08-0703 (E.D. Pa.).  We note that the respective dockets indicate that these cases have been dismissed.

2. Whether the bankruptcy court erred in dismissing the claims for actual fraudulent transfers based on its conclusion that the complaints established the Lenders' affirmative defense of "good faith";

3. Whether the bankruptcy court erred in dismissing the claims for actual fraudulent transfers on the grounds that the Trustee failed to plead the circumstances of fraud with particularity; and

4. Whether the bankruptcy court erred in dismissing the complaints on the basis that the homeowners were necessary parties that must be joined under FED. R. CIV. P. 19(a).

We have jurisdiction to decide these issues pursuant to 28 U.S.C. § 158(a)(1), which grants district courts jurisdiction over appeals from final judgments and orders of the bankruptcy courts.

## IV. DISCUSSION

### A. Standard of Review

Our review of the bankruptcy court's legal determination is de novo. In re United Healthcare Sys., 396 F.3d 247, 249 (3d Cir. 2005). While we would review the bankruptcy court's factual findings for clear error and its exercise of discretion for abuse thereof, none of the issues raised are factual or discretionary in nature. See id.

### B. 12(b)(6) Standard

Federal Rule of Civil Procedure 12(b)(6)[9] permits a court to dismiss all or part of an action for failure to state a claim upon which relief can be granted. When ruling on a Rule 12(b)(6) motion, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000). The court may dismiss a complaint or claim only if it is clear that no relief could be granted under any set of

---

[9] Rule 12 is applicable in bankruptcy cases pursuant to FED. R. BANKR. P. 7012.

facts that could be proved consistent with the allegations. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). However, a plaintiff must provide more than a formulaic recitation of a claim's elements that amounts to mere labels and conclusions. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The complaint's "factual allegations must be enough to raise a right to relief above the speculative level." Id. That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (citing Twombly, 550 U.S. at 570).

In evaluating the sufficiency of a complaint under Twombly and Iqbal, a court must take the following three steps: (1) the court must "tak[e] note of the elements a plaintiff must plead to state a claim;" (2) the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth;" and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Burch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted). Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S. Ct. at 1950.

## C. Constructive Fraud Claims

The Trustee first argues that the bankruptcy court improperly dismissed her constructive fraud counts. On this issue, we disagree with the Trustee, and for the reasons that follow, will affirm the bankruptcy court's dismissal of Counts I, II, and IV.

In order to state a claim for avoidance of a transfer based upon constructive fraud under both the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(B), and PUFTA, 12 Pa. C.S. §§ 5104(a)(2) and 5105,

a plaintiff must allege, among other things, facts demonstrating that the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation. See Fidelity Bond & Mortg. Co. v. Brand, 371 B.R. 708, 719-20 (E.D. Pa. 2007) (noting that federal courts, including the United States Court of Appeals for the Third Circuit, have consistently held that the party challenging a transfer as fraudulent carries the burden of proving by a preponderance of the evidence all elements of a constructive fraud claim under the Bankruptcy Code).

The procedure for evaluating reasonably equivalent value in this circuit requires two steps. First, the court must determine whether the debtor received "any value at all" from the challenged transaction. In re R.M.L., Inc., 92 F.3d 139, 149 (3d Cir. 1996). "Value" is defined by the Bankruptcy Code as "property, or satisfaction or securing of a present or antecedent debt of the debtor . . . ." 11 U.S.C. § 548(d)(2)(A). Second, if the court finds that a debtor received at least some value, it must then decide whether the value received was "roughly the value it gave." In re Fruehauf Trailer Corp., 444 F.3d 203, 212-13 (3d Cir. 2006). In assessing whether reasonably equivalent value was received, the court should look to the "totality of the circumstances," including (1) the "fair market value" of the benefit received as a result of the transfer, (2) "the existence of an arm's-length relationship between the debtor and transferee" and (3) the transferee's good faith. In re R.M.L., 92 F.3d at 148-49. The court may consider in its evaluation both direct and indirect benefits conferred by the transfer. Mellon Bank, N.A. v. Metro Commc'ns, Inc., 945 F.2d 635, 646 (3d Cir. 1991). Further, because the purpose of fraudulent conveyance laws is estate preservation, "the question whether the debtor *received* reasonable value must be determined from the standpoint of the creditors." Id.

The Trustee raises several claims of error with regard to the bankruptcy court's conclusion that the complaints and relevant documents established reasonably equivalent value. First, she argues that the court failed to properly apply the 12(b)(6) standard and instead required a heightened pleading standard. The Trustee points to precedent holding that a plaintiff's allegation that the exchange lacked reasonably equivalent value is sufficient, in of itself, to survive a motion to dismiss. The Trustee further asserts that the bankruptcy court's determination of reasonably equivalent value was improper because that determination is a question of fact that is not amenable to review on a motion to dismiss. (Trustee's Br. 13-17.)

The Trustee also argues that the bankruptcy court failed to apply the "totality of the circumstances" test in reaching its conclusion regarding reasonably equivalent value. She claims that this test requires a court to compare the net commercial value of a debtor before and after the transfer at issue. Given the nature of the Ponzi scheme, the Trustee urges that Image Masters' overall commercial value decreased with each transfer because by stealing money from the homeowners, Image Masters incurred more liability. The Trustee further claims that, with respect to transfers made with money received from the mortgage participation investors, Image Masters did not receive a benefit of any kind because neither those investors nor Image Masters had any contractual obligations to the Lenders. Finally, the Trustee asserts that the bankruptcy court's decision was dependent on an improper factual finding that Image Masters received an indirect benefit. (Id. at 17-22.)

The Lenders respond that the facts alleged in the complaints, as well as the Trustee's admissions before the bankruptcy court, demonstrate that the claims for constructive fraudulent transfers are implausible under the Iqbal standard. Specifically, the Lenders argue that the pleadings and concessions show that: (1) Image Masters had contractually agreed with each homeowner to

13

keep the conventional mortgages current, (2) each payment represented a disbursal to the homeowner of the wrap mortgage loan owed to the homeowner, and (3) Image Masters received a credit in the form of a dollar-for-dollar reduction of antecedent debt in exchange for each payment made to a lender. (Lenders' Br. 22-25.)

The Lenders further assert that it was unnecessary for the bankruptcy court to apply the "totality of the circumstances" test in this case because the value received by Image Masters was an easy-to-quantify benefit, not an intangible one. The Lenders contend that the "totality of the circumstances" test was adopted by the Third Circuit in order to include indirect benefits as a means of establishing reasonable equivalent value, and to assist courts in evaluating reasonable equivalence where the benefit received requires the valuation of property, services or other intangible benefits. They argue that the test is inapplicable here because the determination of reasonable equivalence was a simple mathematical calculation. (Lenders' Br. 25-28.)

In the alternative, Lenders contend that, even if the "totality of the circumstances" test was applicable, the Trustee's pleading nevertheless fails to state a constructive fraud claim. They argue that the Trustee's allegation that Image Masters did not have a contractual obligation with Lenders is of no moment because the complaint and other exhibits establish that Image Masters had contractually agreed with the homeowners to make the payments, and each transfer to Lenders reduced Image Masters' liabilities to the respective homeowner. Additionally, the Lenders argue that the Trustee's argument that each transfer worsened Image Masters' overall financial condition is misplaced, because the pleadings reflect that each transaction was a "wash" from the perspective of Image Masters. (Id. at 25-31.)

In resolving whether the Trustee's complaints sufficiently plead a lack of reasonably equivalent value, we may consider undisputedly authentic documents attached as exhibits to the complaints, or to the motions to dismiss if the documents are "integral to or explicitly relied upon in the complaint[s]." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997). We may also consider statements made by counsel at oral argument "to clarify allegations in the complaint[s] whose meaning is unclear." Maio v. Aetna, 221 F.3d 472, 485 n.12 (3d Cir. 2000).[10]

In pertinent part, the complaints allege that:

> Image Masters received no value whatsoever in exchange for the Transfers alleged in this case -- let alone reasonably equivalent value -- because, among other reasons:
>
> (a)      Image Masters had no obligation to any of the Defendants, and as a result did not receive a reduction or satisfaction of any obligation(s) owed by it to the Defendants when the Transfers were made; and
>
> (b)      As a result of the Ponzi Schemes in general, and the Ponzi Scheme perpetrated by Image Masters in particular, each Transfer sought to be avoided or recovered in this case resulted in increased liability on the part of Image Masters and increased harm to the Ponzi Scheme victims. In short, due to the economic realities of Ponzi Schemes, each time Image Masters made a payment to the Defendants on behalf of one of the Homeowners, Image Masters stole more money from other Ponzi Scheme victims to make the payment on the Conventional Loan, thereby perpetually increasing Image Masters' liabilities in general and obligations to the Ponzi Scheme victims as a whole.

(See Chase Compl. ¶¶ 72, 78, 88.)

For the following reasons, we agree with the bankruptcy court and conclude that these allegations are insufficient under Iqbal and Twombly. First, while we accept as true the Trustee's

---

[10] A fair extension of this rule is that statements made at oral argument may also be considered to clarify any documents attached to or relied upon in a complaint.

assertion that Image Masters did not have any contractual obligations to the Lenders, and thus did not receive a reduction or satisfaction of any obligation to the Lenders, this fact provides an incomplete picture of the Ponzi scheme. The pleadings, relevant documents and the Trustee's statements at the oral argument before the bankruptcy court clearly demonstrate that Image Masters had a contractual obligation to the homeowners to make the payments to the Lenders. (See Chase Action, Doc. No. 1 at ¶¶ 93, 95 (alleging that the transfers were made "to or for the benefit of the Homeowners who had conventional mortgages with one of the [Lenders]" and "on account of antecedent debt owed by Image Masters to these Homeowners"); id., Doc. No. 1, Ex. A at 4, Ex. C at 5 (indicating that Debtors were contractually obligated to make the payments to Lenders based on their agreements with the homeowners); id., Doc. No. 28-4 (demonstrating, through illustrative examples of the mortgage notes between Image Masters and the homeowners, that Image Masters agreed to make payments on homeowners' conventional mortgages as they became due); id., Doc. No. 68 at 84 (noting that the Trustee conceded during oral argument before the bankruptcy court that Debtors had a contractual obligation to the homeowners to make payments to the Lenders). We cannot ignore this fact simply because the Trustee chose not to include it in her fraudulent conveyance counts.

Second, the Trustee's argument that each transfer resulted in increased liability to Image Masters improperly focuses on Image Masters' dealings as a whole, rather than the transaction at issue.[11] When considering the totality of the evidence before us, it is clear that for each dollar

---

[11] The Trustee contends that, in analyzing reasonably equivalent value, Third Circuit precedent requires courts to compare the debtor's overall commercial value before and after the challenged transfers. She points to the following language in support of her contention:

The touchstone [of the reasonable equivalence analysis] is whether the

transferred to a Lender, Image Masters received a dollar reduction in its liability to a homeowner.

For example, if Homeowner A was required to make a $500 monthly payment to his lender under his conventional mortgage, Image Masters agreed and was obligated to make those payments on that homeowner's behalf. In making such payment, Image Masters' liability to Homeowner A was reduced by $500. Thus, there was no depletion to Image Masters' estate as a result of this transaction because the payment to the lender was matched by an equivalent reduction in Image Masters' obligation to the homeowner. From the perspective of estate preservation, the transaction was a wash.

The fact that the nature of the Ponzi scheme was such that Image Masters incurred additional liability (through obtaining new homeowners or investors) in order to make a particular homeowner's payment, does not change our analysis.[12] The proper focus of the reasonably equivalent value inquiry is the specific transaction sought to be avoided, not the transfer's collateral

---

transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred. Thus, when the debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received.

Mellon Bank, N.A. v. Metro Commc'ns, Inc., 945 F.2d 635, 647 (3d Cir. 1991). However, this language is not part and parcel of the court's holding, and is merely an example of how a court can determine that a debtor received value from a transaction. In re R.M.L., 92 F.3d 139, 151 (3d Cir. 1996). Indeed, the Third Circuit later rejected a literal application of the above language. Id. Accordingly, we do not find this approach to be binding, and will follow the line of cases that have focused the reasonable equivalence analysis on the specific transaction at issue.

[12] The Trustee's contention that the transfers at issue may have been paid out of money derived from mortgage participation investors or homeowners unrelated to the transaction (and thus, Image Masters did not satisfy any obligations to these individuals for that transfer) also does not affect our determination. The Trustee has pointed to no case law, nor has our independent review yielded any law, in support of the Trustee's argument that reasonable equivalence requires that the value received must directly flow from the money or asset the debtor transferred.

effects on the welfare of a debtor's business. In re Churchill Mortg. Inv. Corp., 256 B.R. 664, 678 (S.D.N.Y. 2000). Indeed, the Bankruptcy Code defines the test as whether the debtor "received less than a reasonably equivalent value in exchange *for such transfer*." 11 U.S.C. § 548(a)(1)(B)(i); see also Fidelity Bond & Mortg. Co. v. Brand, 371 B.R. 708, 719-20 (E.D. Pa. 2007) (noting that the constructive fraud provisions of PUFTA and the Bankruptcy Code should be construed uniformly).

Further, the practical implications of the Trustee's approach—that is, focusing on the overall effect on a debtor's business rather than the specific transaction—would render constructively fraudulent all transfers made by a Ponzi scheme debtor within the statutory time period. This does not comport with the relevant statutory language, nor the cases within this circuit, which intimate that transfers made by Ponzi scheme debtors may confer reasonably equivalent value. See e.g., Schwartzman v. Hutchison, 2011 WL 4471509, at *3 (E.D. Pa. Sept. 27, 2011); Liebersohn v. Campus Crusade for Christ, Inc., 280 B.R. 103, 111 (Bankr. E.D. Pa. 2002) ("It is also reasonable, and, in this case, appropriate, to infer that, except for transfers to a person who took in good faith and for a reasonably equivalent value, as described in § 5108(a) of PUFTA or in § 548(c) of the Bankruptcy Code, all other transfers made by the debtor during an on-going Ponzi scheme are part of the overall fraud.").

In sum, because the documents that are "integral or explicitly relied upon in the complaint[s]" reflect that each transaction at issue resulted in a dollar-for-dollar reduction in Image Masters' liability to respective homeowners, we find that the Trustee's claims cannot satisfy Iqbal and Twombly's plausibility standard. Accordingly, we will affirm the bankruptcy court's decision with respect to the constructive fraud claims pled in Counts I, II and IV.

### D.    Actual Fraud Claims

The Trustee next contends that the bankruptcy court improperly dismissed Counts I and III, which allege actual fraud.  We agree with the Trustee, and will thus vacate the bankruptcy court's decision on these claims, and remand for further proceedings.

#### 1.    The "Good Faith" Defense

The Trustee first challenges the bankruptcy court's determination that the defense of "good faith" appeared on the face of her complaints.  Under the relevant statutes, a transferee may avoid liability in an action to avoid a transfer based upon actual fraud by demonstrating that it received the transfer for value and in good faith.  11 U.S.C. § 548(c) (Bankruptcy Code); 12 Pa. C.S. § 5108(a), (d) (PUFTA).  "Good faith" is an affirmative defense for which the transferee bears the burden of proof.   See In re Lockwood Auto Grp., Inc., 428 B.R. 629, 636 (Bankr. W.D. Pa. 2010). Nevertheless, a complaint "may be subject to dismissal under Rule 12(b)(6) when an affirmative defense . . . appears on its face." Leveto v. Lapina, 258 F.3d 156, 161 (3d Cir. 2001) (quoting ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994) (internal quotation marks omitted)).  When facts or matters outside of the complaint are necessary to establish the affirmative defense, however, raising it under Rule 12(b)(6) is usually not permitted.  See Worldcom, Inc. v. Graphnet, Inc., 343 F.3d 651, 657 (3d Cir.2003).

In evaluating the good faith element of the defense, a court should apply an objective or "reasonable person" standard, and "look to what the transferee objectively knew or should have known concerning the nature of the underlying circumstances involved with the transfer," not to the subjective knowledge or belief of the transferee.  In re Lockwood Auto Grp., Inc., 428 B.R. at 636. "[A] transferee is not automatically protected by the good faith defense merely because it had no

actual knowledge that a fraud was being perpetrated." Id. Where a transferee is on notice of suspicious circumstances regarding a transfer, "it is obliged to conduct a diligent investigation which must 'ameliorate' the issues that placed it on inquiry notice in the first place" or it may lose the benefit of the "good faith" defense. Id.

The Trustee contends that, in dismissing the actual fraudulent conveyance claims, the bankruptcy court erroneously placed on her the burden to allege and prove that the Lenders lacked good faith. She further asserts that the bankruptcy court improperly found good faith merely because the Lenders lacked a contractual relationship with Image Masters and were thus unlikely to know of the wrongdoing. The Trustee urges that this fact alone cannot sufficiently establish that a reasonable person would not have been placed on notice of the underlying fraud. She points out that it is possible that the Lenders were or should have been aware of the fraud in that each received multiple mortgage payments from a single source and single account, and also received multiple changes of address forms directing correspondence for each homeowner to be forwarded to a P.O. Box "c/o OPFM, Inc." (Trustee's Br. 22-26.)

The Lenders counter that the bankruptcy court properly dismissed the actual fraud claims on the basis of "good faith." The Lenders argue that the Trustee's complaint and admissions expressly establish that Image Masters received value in exchange for the transfers, satisfying the first element of the defense. The Lenders further contend that the complaint establishes the second element of good faith because the allegations demonstrate, on an objective basis, that: (1) the Lenders had no actual knowledge of the Ponzi scheme; (2) there was no contractual relationship between Image Masters and the Lenders; and (3) the Lenders were themselves victims of the scheme. Additionally, the Lenders argue that the Trustee did not plead any suspicious circumstances that would place a

reasonable person on inquiry notice of the fraud. (Lenders' Br. 32-39.)

While it appears that the Lenders may eventually prevail with their "good faith" defense, we are not prepared to reach this conclusion at the pleading stage. As discussed above, the "good faith" defense requires that a defendant neither knew nor had inquiry notice of the fraudulent nature of a transfer. We simply cannot conclude that the complaints foreclose the possibility that the Lenders had notice of the fraud. We acknowledge and appreciate the bankruptcy court judge's extensive experience in dealing with mortgage issues. However, we are not prepared to find, as the bankruptcy court did, that the fact that mortgage lenders receive "thousands of mortgage payments . . . from [their] customers each month" completely bars the possibility that the Lenders may have questioned or inquired about the fact that they received: (1) mortgage payments on behalf of hundreds of unconnected homeowners from the same source; or (2) numerous change of address forms directing that all communications to the homeowners be forwarded to a single post office box. Even assuming that the single source of payments and change of address forms would not place a reasonable lender on inquiry notice, that does not preclude the fact that other information may have been conveyed to the Lenders to place them on notice that something was amiss.

Under the relevant statutes, a plaintiff is not required to allege facts to establish a lack of good faith; it is a defendant's burden to make that showing. Because the Trustee had no obligation to diffuse possible defenses in her complaints, and because we cannot, on the basis of the complaints, find that no circumstances existed to place the Lenders on notice of the fraud, we conclude that dismissal on the basis of the "good faith" defense was improper. See Hecht v. Malvern Preparatory Sch., 716 F. Supp. 2d 395, 402-03 (E.D. Pa. 2010) (finding no good faith defense on the face of the complaint because it did not exclude the potential that transferee should have known of the transfer's

fraudulent nature).

In reaching our decision, we have also carefully considered that remand on this issue will necessitate that extensive, costly discovery will commence, and that the Trustee likely faces an uphill battle on the issue of the Lenders' good faith. Mindful that it will be within the bankruptcy court's province to manage this case going forward, we note that it may be prudent for the parties to first conduct discovery limited to the "good faith" defense, and then have the bankruptcy court consider a renewed motion focused only on that defense before proceeding with full discovery on the merits.

   2.   Rule 9(b)

The Trustee also challenges the bankruptcy court's determination that her complaints failed to satisfy the heightened pleading requirement of Rule 9(b). We again agree with the Trustee, and find that her allegations of actual fraud were sufficient to overcome the motions to dismiss.

Federal Rule of Civil Procedure 9(b)[13] provides that: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). The Third Circuit has explained that Rule 9(b) "requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984). To meet this standard, Plaintiffs may assert allegations of "date, place or time" or may "use alternative means of injecting precision and some measure of substantiation into

---

[13] Rule 9 is applicable in bankruptcy cases pursuant to FED. R. BANKR. P. 7009.

their allegations of fraud." Id.

To state a claim for avoidance of a transfer based upon actual fraud under both the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(A), and PUFTA, 12 Pa. C.S. §§ 5104(a)(1), a plaintiff must allege that the debtor made the transfer with the actual intent to hinder, delay or defraud a creditor. The pleading requirements for such claims are set out by Rule 9(b), which requires a trustee to "plead the circumstances constituting the alleged fraudulent conveyances with particularity." Bratek v. Beyond Juice, LLC, 2005 WL 3071750, at *6 (E.D. Pa. Nov. 14, 2005). Nevertheless, a trustee may plead intent generally under the second sentence of the rule. River Road Dev. Corp. v. Carlson Corp.-Ne., 1990 WL 69085, at *10 (E.D. Pa. May 23, 1990). The requirements of Rule 9(b) are generally relaxed and interpreted liberally where a trustee is asserting the fraudulent transfer claims. In re APF Co., 308 B.R. 183, 188 (Bankr. D. Del. 2004).

The Trustee asserts that the standard imposed by the bankruptcy court was a misapplication and misinterpretation of Rule 9(b), resulting in a heightened pleading burden unsupported by case law, the applicable statutes and the rule itself. Specifically, the Trustee argues that the particularity requirement of Rule 9(b) applies only to the facts underlying the fraudulent conduct, and that the fraudulent intent need only be averred generally. She further contends that the bankruptcy court's reliance on non-binding decisions outside of this circuit was misplaced, and that the bankruptcy court disregarded numerous decisions holding that a plaintiff's allegation of a Ponzi scheme is sufficient to meet actual fraud pleading requirements. As such, the Trustee asserts that her complaints satisfied Rule 9(b) because she specifically alleged that Image Masters acted with the requisite intent to defraud creditors, and that the complaints described in great detail the underlying Ponzi scheme which

supported that intent.  (Trustee's Br. 26-32.)

The Lenders respond that the "Ponzi-scheme presumption" advocated by the Trustee arises only in the context of investors, brokers or other individuals with a close relationship to a Ponzi scheme debtor who directly benefited from the scheme.  They contend that this presumption is inapplicable in cases involving third party transferees who had no relationship to the debtor.  The Lenders further urge that extending the presumption here would allow the Trustee to file suit against "every employee, trade creditor and taxing authority that the Debtors paid over a four year period" and force them "into the expense of full discovery regardless of the total lack of connection" between those individuals and the Ponzi scheme, and regardless of the likelihood that the individuals could assert the affirmative defense of "good faith."  Accordingly, the Lenders assert that the bankruptcy court properly required the Trustee to allege the fraudulent nature of each transfer, particularly given the lack of allegations that the payments to the Lenders "were anything other than legitimate payments made in satisfaction of an antecedent debt owed by [h]omeowners to [Lenders]."  (Lenders' Br. 39-46.)

In her complaints, the Trustee alleged in detail the nature and scope of the Ponzi scheme as well as the dates and amounts of each transfer she sought to avoid.  For the following reasons, we conclude that these allegations are sufficient under Rule 9(b).

First, the majority of case law from courts within this circuit holds that a plaintiff adequately states a claim for actual fraudulent conveyance where the existence of an underlying Ponzi scheme

is pled.[14] See, e.g., Hecht v. Malvern Preparatory Sch. 716 F. Supp. 2d 395, 400-01 (E.D. Pa. 2010) (finding that pleadings detailing the debtor's Ponzi scheme and the transfers at issue more than amply supported actual fraud claims); In re DBSI, Inc., 2011 WL 1810632, at *4 (Bankr. D. Del. May 5, 2011) ("[W]here a Ponzi scheme exists, there is a presumption that transfers were made with the intent to hinder, delay and defraud creditors.  This presumption applies to every transfer from the [debtor].") (citation omitted) (internal quotation marks omitted); In re CF Foods, L.P., 280 B.R. 103, 110-111 (Bankr. E.D. Pa. 2002) (stating "[n]umerous courts have decided that a debtor's actual intent to hinder, delay or defraud creditors may be inferred from the Debtor's active participation in a Ponzi scheme . . ." and a "guilty plea or criminal conviction of the perpetrator of the Ponzi scheme provides evidence of actual fraudulent intent").

Despite the Lenders' contention, we do not find that this presumption only applies in cases involving investors, brokers or other insiders.  Indeed, in Hecht v. Malvern Preparatory School, a case in which a trustee sought to avoid purported charitable donations to a school, the court found that Rule 9(b) was satisfied in that the complaint contained numerous allegations detailing the nature and scope of the Ponzi scheme and set forth the date, time and place of the transfers made to the defendant.  716 F. Supp. 2d at 397, 400-01.  While the transfers at issue here were payments that Image Masters was obligated to make under its agreements with the homeowners, we find that those are distinctions without a difference.

--------

[14] We note that in cases involving Ponzi schemes, there is direct evidence that the transferor acted with a fraudulent purpose.  Therefore, there is no need for a plaintiff to assert "badges of fraud" to meet her pleading burden.  See In re American Rehab & Physical Therapy, Inc., 2006 WL 1997431, at *16 (Bankr. E.D. Pa. May 18, 2006) (noting that, because transferors rarely admit that they acted with a fraudulent purpose, a trustee typically must use circumstantial evidence—namely "badges of fraud"—to prove actual intent).

Further, we agree with the Trustee that the cases relied upon by the bankruptcy court are not applicable. Neither In re Carrozzella & Richardson nor In re Churchill Mortgage Investment Corp. even considered Rule 9(b). 286 B.R. 480 (D. Conn. 2002) (addressing a claim for constructive, as opposed to actual, fraud); 256 B.R. 664 (S.D.N.Y. 2000) (addressing claims for constructive and actual fraud, but not specifically addressing whether Rule 9(b) was satisfied with respect to the actual fraud counts). The language the bankruptcy court cites from those cases was made in reference to constructive fraud counts and the reasonably equivalent value inquiry. In addition, In re Churchill Mortgage Investment Corp. expressly noted that a plaintiff meets her burden of alleging actual fraud by pleading the existence of an underlying Ponzi scheme. 256 B.R. at 675-76 (dismissing actual fraud claim not for inadequate pleading, but based on the value and good faith defense). In re Sharp International Corp., another case cited by the bankruptcy court, is also distinguishable in that: (1) it did not involve a Ponzi scheme, but a different fraudulent scheme, and (2) the avoidance action was brought under New York law, which does not permit a good faith exception to an actual fraudulent conveyance claim. 403 F.3d 43, 46-48, 56-57 (2d Cir. 2005). Lastly, none of these cases impose a duty on a trustee to allege that a defendant had knowledge of or participated in the underlying fraud in order to state a claim for actual fraud.

Moreover, we note that our decision is in accord with the plain language and purpose of Rule 9(b), which expressly requires that fraud be pled with particularity, but states that intent need only be alleged generally. See FED. R. CIV. P. 9(b). The purpose of the particularity requirement is to provide the defendant with sufficient identification of the circumstances of the alleged fraud so that he can prepare an adequate answer to the allegations. Denny v. Carey, 72 F.R.D. 574, 578 (E.D. Pa. 1976). The Trustee's complaints satisfy the language and objective of the rule.

### E. Joinder

Finally, the Trustee challenges the bankruptcy court's dismissal of all counts on the basis that the homeowners were necessary parties that were required to be joined under FED. R. CIV. P. 19.[15]

Rule 19(a)(1) requires the mandatory joinder of absent parties under certain enumerated circumstances. Gen. Refractories Co. v. First State Ins. Co., 500 F.3d 306, 312 (3d Cir. 2007). In relevant part, Rule 19(a)(1) provides:

> A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). The party requesting joinder of a necessary party need only establish that one of the grounds under Rule 19 exists. Whyham v. Piper Aircraft Corp., 96 F.R. 557, 560 (M.D. Pa. 1982); see also Koppers Co. v. Aetna Cas. & Sur. Co., 158 F.3d 170, 175 (3d Cir. 1998) ("As Rule 19(a) is stated in the disjunctive, if either subsection is satisfied, the absent party is a necessary party that should be joined if possible."). In the event a plaintiff has not originally joined a necessary party, the proper remedy is to order joinder. FED. R. CIV. P. 19(a)(2).

---

[15] Federal Rule of Civil Procedure 12(b)(7) provides for dismissal of a complaint for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7). As with a motion to dismiss pursuant to Rule 12(b)(6), a court reviewing a Rule 12(b)(7) motion must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. Cummings v. Allstate Ins. Co., 2011 WL 6779321, at *3 (citing Pittsburgh Logistics Sys., Inc. v. C.R. England, Inc., 669 F. Supp. 2d 613, 618 (W.D. Pa. 2009)). A court may also consider "relevant, extra-pleading evidence" when ruling on such motions. Id. (quoting Citizen Band Potawatomi Indian Tribe of OK v. Collier, 17 F.3d 1292, 1293 (10th Cir. 1994) (internal quotation marks omitted)).

Each ground under Rule 19(a)(1) requires a distinct analysis. Under Rule 19(a)(1)(A), it must be determined "whether complete relief may be accorded to those persons named as parties to the action in the absence of any unjoined parties . . . ." Gen. Refractories Co., 500 F.3d at 312 (citing Angst v. Royal Maccabees Life Ins. Co., 77 F.3d 701, 705 (3d Cir. 1996)). In evaluating this subsection, the focus is solely on the named parties, and any effect a decision may have on absent parties is immaterial. Id.

On the other hand, under Rule 19(a)(1)(B)(i), we must consider the effect that resolution of the dispute may have, not on named parties, but on any absent parties. "Satisfying this subsection initially requires that the absent party claim a legally protected interest relating to the subject matter of the action." Kendall v. Superior Court of the Virgin Islands, 2012 Wl 4620085, at *2 (D.V.I. Oct. 3, 2012). A mere financial interest in the matter is insufficient. Liberty Mutual Ins. Co. v. Treesdale, Inc., 419 F.3d 216, 230 (3d Cir. 2005).

Under Rule 19(a)(1)(B)(i), once an adequate interest is demonstrated, it must then be determined whether deciding the action in the party's absence would impair or impede the absent party's ability to protect its interest in the subject matter of the litigation. This generally requires a showing "that some outcome of the federal case that is reasonably likely can preclude the absent party with respect to an issue material to the absent party's rights or duties under standard principles governing the effect of prior judgments." Janney Montgomery Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399, 409 (3d Cir. 1993). Joinder may also be required absent a preclusive effect where the effect of the court's decision on the absent party is "direct and immediate." See id. (implying that the phrase "as a practical matter impair or impede" may have a broader meaning than that given by principles of preclusion).

Lastly, under Rule 19(a)(1)(B)(ii), we must decide whether the absent party claims an interest in the subject matter of the action such that continuation of the matter would expose the named parties to the "substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." This rule was intended to protect named parties against inconsistent obligations, not inconsistent adjudications. Holber v. Jacobs, 401 B.R. 161, 175 n.18 (Bankr. E.D. Pa. 2009) (citing Transdermal Prods., Inc. v. Performance Contract Packaging, Inc., 1996 WL 515497, at * 2 (E.D. Pa.1996)). In other words, Rule 19(a)(1)(B)(ii) "protects a party against situations in which two court orders may be entered and compliance with one might breach the other . . . ." Id. (citing Transdermal Prods., Inc., 1996 WL 515497, at *2). By contrast, it does not apply in situations where a defendant may "successfully defend[] a claim in one forum, yet lose[] on another claim arising from the same incident in another forum." Id. (citing Delgado v. Plaza Las Americas, Inc., 139 F.3d 1, 3 (1st Cir.1998)) (internal quotation marks omitted). Where two suits arising from the same incident involve different causes of action, defendants are generally "not faced with the potential for double liability because separate suits have different consequences and different measures of damages." Id. (quoting Delgado, 139 F.3d at 3). However, where there are "claims by two parties in two suits to the same preferential payments," joinder may be required to protect against the risk of duplicative liability. See In re Torcise, 116 F.3d 860, 866 (11th Cir. 1997). Finally, the risk at issue must be "substantial," consisting of "more than a mere possible risk of litigation." Sindia Expedition, Inc. v. Wrecked and Abandoned Vessel known as "The Sindia", 895 F.2d 116, 122 (3d Cir. 1990).

The Trustee asserts several claims of error with respect to the bankruptcy court's decision on joinder. First, she argues that the bankruptcy court erred in requiring joinder under Rule

19(a)(1)(B)(i). Specifically, the Trustee contends that the homeowners have not asserted a legally protected interest relating to the subject matter of the action, and in any event, any interest they possess is solely financial in nature. The Trustee asserts that a judgment in its favor will have no preclusive effect on the homeowners' potential claims or defenses against the Lenders, nor will it directly or immediately impair or impede the homeowners' ability to defend themselves in any subsequent actions taken by the Lenders. (Trustee's Br. 34-38.)

The Trustee also contends that the bankruptcy court erred under Rule 19(a)(1)(B)(ii) in concluding that the Lenders faced the substantial risk of incurring double or inconsistent obligations. She argues that the Lenders are not faced with this possibility because: (1) the Jones and Lorah matters have been dismissed in their entirety; (2) the Jones matter ultimately involved the claims of only a few of the homeowners against some of the Lenders; and (3) the causes of action asserted and remedies sought in this action and the Jones' action are different. (See supra note 8.) She further urges that the absence of the homeowners did not create the possibility that the Lenders would incur double or inconsistent obligations "for the simple reason that only the Trustee can seek to avoid and recover fraudulent transfers." As such, the Trustee contends that the Lenders have only articulated the possibility of inconsistent results, and not the requisite inconsistent obligations. (Id. at 38-43; see Telephone Conf. Tr. 34:23-35:9, Dec. 21, 2012.)[16]

_____

[16] The Trustee also generally contends that joinder was improper because, as a matter of law, the only parties necessary to fraudulent transfer claims are the transferor and transferees. (Trustee's Br. 33.) Lenders respond that the Trustee waived this argument in that she did not raise it before the bankruptcy court, and claim that the statutory language does not support the Trustee's position. (Lenders' Br. 48-49.) We agree with Lenders that this argument is meritless.

Further, the Trustee argues that the Lenders should be judicially estopped from pressing their Rule 19 argument because they opposed a motion by the homeowners to transfer the Jones action from the district court to the bankruptcy court. (Trustee's Br. 44-46.) We review the bankruptcy

The Lenders counter that the bankruptcy court properly concluded that homeowners were necessary parties. They first argue that the homeowners have a strong interest in the bankruptcy proceeding, through the mortgage accounts they have with the Lenders. The Lenders stress that this interest is not merely "financial" as it involves payments on mortgages that were secured by the homeowners' homes. The Lenders further claim that, if the Trustee prevails in avoiding the transfers, the homeowners will face the "immediate prospect of default and a possible foreclosure," which is sufficient to satisfy the "direct and immediate" effect required under this circuit's precedent. (Id. at 49-54.)

The Lenders also assert that the bankruptcy court correctly held that the homeowners should be joined to protect the Lenders against inconsistent rulings and duplicative relief. Specifically, they contend that the homeowners' lawsuits that were pending against them,[17] and the fact that the homeowners remain free to file individual lawsuits relating to Image Masters, presents the risk of inconsistent rulings as well as the potential that the Lenders could be found liable twice for the same conduct. (Id. at 54-58.)[18]

_____

court's decision on whether to invoke judicial estoppel "only for abuse of discretion . . . [asking whether] its ruling is founded on an error of law or a misapplication of law to the facts." In re Kane, 628 F.3d 631, 636 (3d Cir. 2010) (quoting Montrose Med. Grp. Participating Sav. Plan, 243 F.3d at 780) (internal quotation marks omitted). After careful consideration of the bankruptcy court's opinion as well as the parties' arguments, we find that the court did not abuse its discretion in determining that judicial estoppel did not apply.

[17] The Lenders advised at the December 21, 2012 telephone conference and in their supplemental letter brief that there are currently two pending actions involving a lender and a homeowner who entered into a mortgage with Image Masters: (1) Racosky, et. al. v. CitiMortgage, Inc., et al. (Pa. C.C.P., Northampton Co.), and (2) CitiMortgage, Inc. v. Eberly, et al., Dkt. No. 12-05202 (Pa. C.C.P., Lancaster Co.).

[18] The Lenders also assert that we may affirm the bankruptcy court's decision on the basis of their previously-raised argument that joinder is necessary to accord complete relief. (Lenders' Br.

After careful consideration, we find that the bankruptcy court correctly concluded that Rule 19(a)(1)(B)(i) requires joinder of the homeowners. Despite the Trustee's contention to the contrary, the homeowners have more than a financial interest in the subject matter of the actions. The Trustee seeks avoidance of transfers that Image Masters made on behalf of the homeowners to satisfy each homeowner's respective conventional mortgage obligations. Because the homeowners are parties to the mortgage contracts at issue, they have a sufficient interest in the litigation.

Further, we conclude that, as a practical matter, disposing of the actions in the homeowners' absence may impair or impede their ability to protect their interests. While there will be no preclusive effect, a decision in favor of the Trustee would directly and immediately affect the homeowners' rights under their conventional mortgages. Indeed, to the extent that the mortgages remain in effect, each payment avoided through the Trustee's action would increase the respective homeowner's

---

47 n.24.) In their motions to dismiss, the Lenders argued that homeowners were in fact "initial transferees" because "the substance of [each transfer] was that the funds were advanced to the Homeowner and then used to pay the Homeowner's Conventional Mortgage." The Lenders contend that complete relief cannot be granted because 11 U.S.C. § 550 requires that a trustee bring a suit against the initial transferee before she can recover a transfer from a subsequent transferee. (Chase Action, Doc. No. 28, at 31-34.)

We note that courts are split on this issue, compare In re Int'l Admin. Servs., Inc., 408 F.3d 689, 706 (11th Cir. 2005) (quoting In re Richmond Produce Co., Inc., 195 B.R. 455, 463 (Bankr. N.D. Cal. 1996) ("once the trustee proves that a transfer is avoidable . . . he may seek to recover against any transferee, initial or immediate, or an entity for whose benefit the transfer is made")), with In re Slack-Horner Foundries Co., 971 F.2d 577, 580 (10th Cir. 1992) (holding that a trustee could only recover from a subsequent transferee if the trustee "first ha[d] the transfer of the debtor's interest to the initial transferee avoided under § 548"). We find persuasive those cases that have held that § 550 does not render recovery from a subsequent transferee dependent on a prior action or recovery against the initial transferee. Indeed, the language of § 550 provides that a trustee may recover from either: the initial transferee or any immediate or mediate transferee of the initial transferee. 11 U.S.C. § 550(a). Therefore, even assuming the homeowners are initial transferees and Lenders are merely subsequent transferees, the Trustee may still obtain complete relief in pursuing its action only against the Lenders.

liability under his mortgage, and immediately place them in breach of contract. See, e.g., In re Coutee, 984 F.2d 138, 141 (5th Cir. 1993) (noting that avoidance of payment causes the parties to be returned to the status quo ante—that is, it is as if the payment was never made). Thus, joinder is necessary to ensure that the homeowners can protect their interests.

In light of the Trustee's estimate that the majority of the mortgages have been satisfied and released as well as the Lenders' agreement that some mortgages may have been refinanced, (see Telephone Conf. Tr. 8:1-9, 10:7-10), all homeowners are not necessary parties. Therefore, as a practical matter, joinder should be limited to those homeowners who would immediately be placed in breach of contract upon avoidance of the transfers at issue (e.g., homeowners who have maintained the same mortgage, and have not yet paid it in full).

Although we agree with the Lenders that joinder is required under Rule 19(a)(1)(B)(i), we conclude that they have not established the necessity of joinder under Rule 19(a)(1)(B)(ii). In making this decision, we again note that the Jones and Lorah class action suits have been dismissed. Although Lenders indicated that there are two other pending actions which involve a lender and a homeowner who entered into a mortgage agreement with Image Masters, the pendency of these actions will not expose Lenders to a substantial risk of incurring double, multiple or otherwise inconsistent obligations. Only one of the suits asserts claims against any of the named Lenders, and the other is a foreclosure action brought by a Lender against a homeowner. The suit involving the Lender-defendants is not an attempted class action, and asserts claims against only two of the named Lenders. This suit alleges different causes of action than those asserted by the Trustee, and does not attempt to recover the same payments. As such, even if both cases are decided against the Lenders, they would not be faced with inconsistent obligations as they could comply with both directives.

Finally, although the Lenders argue that there may be future cases against them, they have not sufficiently articulated how such cases would expose them to a substantial risk of incurring double, multiple or otherwise inconsistent obligations. This appears unlikely as the class action attempts have failed and many of the loans may have been restructured or released. Therefore, joinder is inappropriate on these grounds.

In sum, because joinder of certain homeowners is required under Rule 19(a)(1)(B)(i), we will remand for further proceedings.

## V. <u>CONCLUSION</u>

For the foregoing reasons, the bankruptcy court's orders dated December 17, 2009 and February 4, 2010 in the Chase Action and March 3, 2010 in the ABN Action will be affirmed in part, vacated in part and remanded for further proceedings consistent with this Memorandum Opinion.

An appropriate Order follows.