**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LYNN E. FELDMAN, as Chapter 7 Trustee of the Estate of IMAGE MASTERS, INC.,** | **Civil Action** |
| | **No. 10-cv-1141** |
| *Plaintiff*, | |
| *v.* | **Adversary Proceeding** |
| | **No. 09-ap-2092** |
| **SUNTRUST BANK et al.,** | |
| *Defendants*. | **Bankruptcy Docket** |
| *(In re* **IMAGE MASTERS, INC.,** *et al.)* | **No. 07-bk-21587** |

<u>**MEMORANDUM OPINION**</u>

**Goldberg, J.**                                                      **September 6, 2024**

**CONTENTS**

I.   INTRODUCTION ................................................................................................. 2
II.  FACTS ................................................................................................................. 4
   A.   Image Masters' Ponzi Scheme ..................................................................... 4
   B.   First- and Second-Level Transfer Defendants ............................................. 5
   C.   "Red Flags" ................................................................................................. 7
     1.   The Red Flags ........................................................................................... 8
     2.   Implications of the Red Flags ................................................................... 9
III. THE TRUSTEE'S CLAIMS AND APPLICABLE DEFENSES ....................... 10
   A.   Grounds for Avoiding Transfers ................................................................ 11
     1.   Fraudulent Transfers ............................................................................... 11
     2.   Preferences .............................................................................................. 12
   B.   Defenses Raised as to Avoidability ........................................................... 12
     1.   Good Faith (Fraudulent Transfer) ........................................................... 12
     2.   Ordinary Course of Business ................................................................... 13
     3.   Subsequent New Value ............................................................................ 13
     4.   Securities Safe Harbor ............................................................................ 14
   C.   Recovering Avoided Transfers .................................................................. 14
     1.   Entities Liable to Return Avoidable Transfers ........................................ 14
     2.   Good Faith (Recovery from Subsequent Transferees) ............................. 15
IV.  PROCEDURAL HISTORY ............................................................................... 15

**V.   LEGAL STANDARD** ................................................................................................... **18**
**VI.  DISCUSSION** ............................................................................................................. **19**
  **A.**   **Good Faith as to Fraudulent Transfer Claims** ................................................ **19**
    1.   Standard ............................................................................................................ 20
    2.   Analysis—Fraudulent Transfer Claims ........................................................... 24
  **B.**   **"Transferee" and "Conduit" Status** ............................................................... **29**
  **C.**   **Actual Fraudulent Transfers** ......................................................................... **37**
  **D.**   **Defenses Specific to Preference Claims** ....................................................... **39**
    1.   Ordinary Course of Business ........................................................................... 40
    2.   Subsequent New Value .................................................................................... 42
  **E.**   **Securities Safe Harbor** ................................................................................... **44**
  **F.**   **Other Issues** .................................................................................................... **47**
    1.   Initial and Subsequent Transferees ................................................................. 47
    2.   Good Faith as to Preference Claims ................................................................ 48
**VII. CONCLUSION** ............................................................................................................ **49**

# I.   INTRODUCTION

This lawsuit stems from a $65 million Ponzi scheme perpetrated by Wesley Snyder through his then-existing companies Image Masters, Inc. and others (collectively "Image Masters"). Snyder's scheme involved promises to invest clients' money to pay off their home mortgages. Clients were convinced to send Image Masters periodic payments, which Image Masters would combine with proceeds from its purported investments to satisfy the clients' monthly payment obligations. In reality, Image Masters had few investments, and instead used money from later clients to make mortgage payments for earlier clients. Thus, it was a Ponzi scheme. See Image Masters, Inc. v. Chase Home Fin. (In re Image Masters, Inc.), 489 B.R. 375, 381-82 (E.D. Pa. 2013).

Snyder's scheme eventually collapsed, and Image Masters is now in bankruptcy before the United States Bankruptcy Court for the Eastern District of Pennsylvania, where the Trustee, Lynn E. Feldman, has been appointed to manage its assets. In 2009, the Trustee commenced an adversary proceeding against financial institutions who had received Image Masters' mortgage payments, seeking to recover these payments for Image Masters' creditors. The Trustee alleges these

payments are subject to avoidance under the Bankruptcy Code either as fraudulent transfers or preferences.

Some Defendants settled with the Trustee, while all remaining Defendants moved for summary judgment.[1] On February 6, 2023, the Bankruptcy Court, which is handling the Trustee's lawsuit for pretrial matters pursuant to 28 U.S.C. § 157(c)(1), issued a Report and Recommendation granting Defendants' summary judgment motions in substantial part while denying them in limited respects. Briefly summarized, the Bankruptcy Court recommended granting summary judgment to most Defendants (all except SunTrust) on the issue of whether they received Image Masters' payments in "good faith," finding Defendants were unaware of Image Masters' Ponzi scheme. The Bankruptcy Court also recommended granting summary judgment to most Defendants on the ground that they were "mere conduits" rather than "transferees" of Image Masters' payments. Other recommendations were made on defenses specific to preference claims and as to whether Image Masters' payments qualified as actual fraudulent transfers, among other issues. (Revised R&R, Ex. A to ECF No. 410 in 09-ap-2092.)

All parties object to aspects of the Bankruptcy Court's recommendation. The Trustee objects to the ruling on good faith, and one Defendant, SunTrust, objects to the Bankruptcy Court's finding of a factual dispute as to its good faith. All Defendants object to the Bankruptcy Court's articulation of the good faith standard, although most Defendants agree with its ultimate resolution. The Trustee objects to the Bankruptcy Court's recommendation regarding whether most

---

[1] Remaining Defendants are CitiMortgage, Inc., ABN Amro Mortgage Group, Principal Residential Mortgage, Wells Fargo Home Mortgage, Wells Fargo Bank, N.A., SunTrust Bank, Countrywide Home Loans, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, Bank of New York, and Park Granada, LLC.

Defendants were "conduits" of Image Masters' payments. Further objections have been raised to the Bankruptcy Court's rulings on defenses to preference claims and other issues.

The matter is now before me on review of the Bankruptcy Court's recommendations and the objections raised. For the reasons set out below, I agree with the Bankruptcy Court's resolution of the good faith defense as to all Defendants except SunTrust. I also agree with the Bankruptcy Court's rulings on defenses specific to preference claims, as well as the other issues discussed in this Opinion. However, I disagree with the Bankruptcy Court that a factual dispute exists as to SunTrust's good faith. I also disagree with the Bankruptcy Court's resolution of the "conduit" issue, and find that the Trustee has offered sufficient evidence for a factfinder to conclude that all Defendants were transferees rather than conduits.

## II.   <u>FACTS</u>

While this lawsuit presents numerous complex legal issues, the facts necessary to resolve them are mostly undisputed, and the parties generally do not object to the recitation of facts set out in the Bankruptcy Court's Report and Recommendation. Because Defendants are the parties moving for summary judgment, the below facts are presented in the light most favorable to the Trustee. I adopt the Bankruptcy Court's recitation of the facts to the extent those facts are not objected to. <u>See</u> 28 U.S.C. § 157(c)(1) (requiring the district court to review "those matters to which any party has timely and specifically objected").

### A.   **Image Masters' Ponzi Scheme**

Image Masters solicited clients who were homeowners struggling to repay their existing mortgages. With Image Masters' help, the homeowners would take out new mortgages in amounts greater than their outstanding balances (known as a "cash-out refinance"). Part of the funds from the new mortgages would be used to extinguish the old mortgages, and the excess (what has been

called the "wrap") was given to Image Masters to "invest." The homeowners would send Image Masters periodic payments, and Image Masters would combine those with proceeds from its "investments" to meet the homeowners' monthly mortgage obligations. Image Masters would send payments directly to the lending banks on the homeowners' behalf.

The supposed benefit to the homeowners was that their payments to Image Masters would be lower (or fewer in number) than the ones they were obligated to make under the terms of their mortgages. The difference allegedly came from Image Masters' investments. In reality, Image Masters only invested a small portion of the homeowners' money, and, for the most part, the later clients' money was used to benefit earlier clients, as in a typical Ponzi scheme. Snyder also took money for himself and his family. The scheme eventually collapsed, and Image Masters ended up in bankruptcy. (Revised R&R at 2-3; Trustee's Ex. 3 (Snyder's Guilty Plea Colloquy) at 2-10.)

### B.      First- and Second-Level Transfer Defendants

The Trustee's lawsuit seeks to recover Image Masters' mortgage payments for the benefit of all creditors. The Trustee has sued every lender who handled Image Masters' payments, some of which were passed on from one financial institution to the next. Because the parties dispute which Defendants count as "transferees" liable to return Image Masters' payments, it is necessary to examine how and why these multi-step transfers occurred.

Adopting the Bankruptcy Court's terminology, the "First-Level Transfer Defendants" received Image Masters' payments directly. These Defendants are CitiMortgage, Inc. ("Citi"),[2] Wells Fargo Home Mortgage ("Wells Fargo Mortgage"), SunTrust Bank ("SunTrust"), and Countrywide Home Loans ("Countrywide"). The First-Level Transfer Defendants subsequently

---

[2] The Bankruptcy Court used the term "Citi" to include ABN Amro and Principal Residential Mortgage (now part of Citi), and thus I will do the same.

passed some or all of those payments to the Second-Level Transfer Defendants—the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac," and, collectively with Fannie Mae, the "government sponsored enterprises" or "GSEs"), Bank of New York ("BNY"), Park Granada, LLC ("Park Granada"), and Wells Fargo Bank, N.A. ("Wells Fargo Bank").[3]

Generally, the First-Level Defendants were home mortgage lenders who either extended, or otherwise became involved in servicing, loans to Image Masters' clients—the homeowners. After the loans were made, the First-Level Defendants sold them to other financial institutions, including the Second-Level Defendants. The First-Level Defendants would continue to act as "servicers" of the loans, meaning they received Image Masters' payments and, per the terms of various "servicing agreements," sent these payments along to the purchasers of the loans—the Second-Level Defendants. In some cases, the First-Level Defendants became involved with loans they had purchased from other entities and later resold to the Second-Level Defendants, and for these, too, they continued to act as servicers. The First-Level Defendants do not dispute that Image Masters sent its payments directly to them—rather than to other entities previously or subsequently associated with the loans. (Small Dep. (Citi Designee), Trustee's Ex. 7,[4] at 29:6-12; SunTrust's

---

[3] As the Bankruptcy Court explained, Wells Fargo Home Mortgage and Wells Fargo Bank filed a joint summary judgment motion that conflated the two entities as "Wells Fargo," despite the Trustee having parsed out distinct payments each received in her Third Amended Complaint. The Bankruptcy Court appears to have expended considerable effort sorting out which facts applied to which Defendant, and its resolution of those issues has not been objected to.

Since the Trustee's lawsuit was filed, several Defendants have undergone mergers and are now under common ownership. However, the parties have not suggested that those transactions are relevant to any issue at summary judgment.

[4] Exhibit numbers refer to the exhibits to the parties' original summary judgment briefing. Exhibits not under seal are available on the adversary proceeding docket, 09-ap-2092.

Facts[5] (ECF No. 304-2 in 09-ap-2092) ¶¶ 33-34; Wells Fargo's Facts (ECF No. 303-2 in 09-ap-2092) ¶ 37; Trustee's Ex. 14 at FNMA003013 (calling for Wells Fargo to "mak[e]" mortgage loans and sell them to Fannie Mae); Bosier Dep. (Wells Fargo designee) (Trustee's Ex. 11), at 25:4-6; Countrywide Facts (ECF No. 305-1 in 09-ap-2092) ¶¶ 1, 3; Trustee's Ex. 16 at FNMA002887 to ~90; Jenkins Dep. (Countrywide Designee) (Trustee's Ex. 8) 17:19-21.)[6]

Two Second-Level Defendants, the GSEs (government-sponsored enterprises) Fannie Mae and Freddie Mac, also passed Image Masters' payments along to other entities, but their situation is more complicated. Rather than sell the loans outright, the GSEs would "pool" them into what they call "securitization trusts," although their briefing does not clarify what type of legal entity these trusts were or who held legal title to trust assets in the interim. (GSEs' Ex. C, Patane Affidavit, ¶ 10; GSEs' Ex. D, Felix Affidavit, ¶ 10.) These trusts had "investors," and, per the terms of the trusts' "securitization documents," the GSEs' would send the appropriate investors their shares of any payments received. (Patane Affidavit ¶¶ 11-13; Felix Affidavit ¶¶ 11-13.)

### C.    "Red Flags"

All Defendants raise defenses related to taking Image Masters' mortgage payments in "good faith," a term that generally entails lack of notice of the facts making the payments avoidable under the Bankruptcy Code or state law. It is therefore necessary to examine what Defendants knew about Image Masters' Ponzi scheme.

All Defendants argue they lacked actual knowledge of Image Masters' Ponzi scheme. (Revised R&R at 46.) They support that assertion through declarations by corporate

---

[5] Statements of facts refer to those offered in support of summary judgment, which are available on docket 09-ap-2092.

[6] The Bankruptcy Court correctly held that the Trustee's objection that certain cited documents "speak for themselves" is insufficient to raise a dispute of fact.

representatives attesting to their lack of knowledge or with evidence that they had no direct dealings with Image Masters, corroborated by the fact that Image Masters' scheme went undetected by regulators and the homeowners. (Citi Facts ¶ 19; Countrywide Facts ¶¶ 23-27; SunTrust Facts (ECF No. 304-2) ¶¶ 7-8, 12; Wells Fargo Facts ¶ 8; Third Amended Complaint ¶ 54.) The Bankruptcy Court's analysis treated it as undisputed that Defendants were not actually aware of the fraud, and the Trustee does not object to that aspect of the Bankruptcy Court's recommendation. (Revised R&R at 46-47, 63-72; Trustee's Objections (ECF No. 411-1 in 09-ap-2092) at 25-26.) I therefore take it as undisputed for purposes of this Opinion that all Defendants lacked actual knowledge that Image Masters was running a Ponzi scheme.

Instead, the Trustee maintains that Defendants were constructively on notice of Image Masters' Ponzi scheme because they received "red flags" that would have prompted a reasonable mortgage lender to inquire further and thereby uncover the fraud.

### 1.   The Red Flags

The Trustee alleges red flags that generally fall into three categories, discussed below.

#### a)   Address Changes

Soon after helping its clients take out new loans, Image Masters had them execute change-of-address forms submitted to the First-Level Defendants. The forms directed all loan-related communications to Image Masters rather than the homeowners. Similarly, the First-Level Defendants sometimes received communications such as tax documents directly from Image Masters that would normally be expected to come from the borrower. The Trustee's experts opines that these were red flags because they kept the homeowners in the dark about how much Image Masters was paying on their loans. In addition, industry guidance lists changes of address on owner-occupied homes as a possible indicator of fraud. (Scherf Report (Trustee's Ex. 5) at 17-21.)

b)      Third-Party Payments

Image Masters sent checks to the First-Level Defendants for the homeowners' mortgage payments, sometimes combining multiple homeowners' payments in the same envelope. The Trustee's expert does not explain why this was problematic, but refers to industry guidance listing "[c]hanges in person/entity making payments on loans" and "[n]umerous applications from a particular broker are provided possessing unique similarities" as examples of red flags. (Scherf Report at 17, 20.)

c)      Borrower Confusion

In communications with the First-Level Defendants, some homeowners expressed confusion over whether they even had a loan or the amount of their monthly payments. Some homeowners told the First-Level Defendants they paid Image Masters an amount less than what Image Masters sent the bank. (Scherf Report at 21-24, 28, 30, 33-34.) In some cases, the homeowners became upset that the First-Level Defendants had even contacted them. (Scherf Report at 27.) The Trustee's expert opines that these communications "should have triggered follow up questions … in order to find out why Image Masters was causing so much confusion among its customers." (Scherf Report at 26.)

2.      Implications of the Red Flags

The Trustee's expert concedes that the above red flags were not "problematic" in isolation and, moreover, none indicated Image Masters was running a Ponzi scheme. (See Scherf Report at 14-15; Scherf Dep. (Citi's Ex. 34) at 344:16-21.) Rather, it is the Trustee's position that these red flags should have alerted Defendants to "possible issues" with the loans, such as misrepresentations of borrowers' identities or the occupancy status of the homes. For that reason,

the Trustee's expert asserts it was industry knowledge that red flags of this nature warranted investigation. (Scherf Report at 9-13.)

However, the Trustee has provided little information about what type of investigation would have been appropriate or how an investigation would have led Defendants to uncover the fraud. At deposition, the Trustee's expert stated that it would be within Defendants' "discretion" how to investigate, and suggested they could have "obtained documents on [Image Masters'] wrap mortgage program." (Scherf Dep. (Countrywide Ex. 2, ECF No. 305-5) at 175:14-22, 340:5-341:4.)

Ultimately, the Trustee's expert opined Defendants would have discovered Image Masters' Ponzi scheme if they had calculated Image Masters' return-on-investment and discovered it was unrealistically high. According to the expert, this could be done by obtaining documents showing how much the homeowners paid Image Masters each month, how much Image Masters sent Defendants each month, and how much the homeowners had given Image Masters to "invest." From those numbers, the Trustee's expert opines that Defendants could have calculated what return-on-investment Image Masters needed to cover its obligations, and would have discovered it to be about 10% annually—implausibly high for the safe investments Image Masters had promised its clients. Thus, that would have been a clue that returns were actually stolen from other investors, making it a Ponzi scheme. (Scherf Report at 6-8.) However, the Trustee's expert does not explain why an investigation into the red flags would have included Image Masters' return-on-investment or what Image Masters' return-on-investment had to do with the red flags.

## III.   THE TRUSTEE'S CLAIMS AND APPLICABLE DEFENSES

The Bankruptcy Code empowers trustees to "avoid" and "recover" certain transfers made by the debtor so that the funds can be returned to the bankruptcy estate for the benefit of creditors.

Avoidance claims are reviewed under a two-part analysis. See In re Mercon Indus., Inc., 37 B.R. 549, 551 (Bankr. E.D. Pa. 1984). First, the bankruptcy trustee must show that the transfer is "avoidable" under an applicable section of the Code (such as §§ 544, 547, or 548). Then, a separate provision (§ 550) governs how the trustee may recover the transferred value.

### A.      Grounds for Avoiding Transfers

The Trustee asserts that Image Masters' mortgage payments are avoidable either as fraudulent transfers or as preferences.

#### 1.      Fraudulent Transfers

"The law prohibiting fraudulent transfers protects creditors from transactions undertaken by the debtor prior to bankruptcy proceedings which deplete the pool of assets that will eventually be available to satisfy the creditors' claims." In re Palladino, 942 F.3d 55, 58 (1st Cir. 2019). There are two types of fraudulent transfers: "actual" and "constructive." Previously, I dismissed the Trustee's claims for constructive fraudulent transfers but allowed claims for actual fraudulent transfers to proceed.

Under the Bankruptcy Code, a transfer is actually fraudulent if the debtor made it "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became … indebted." 11 U.S.C. § 548(a)(1)(A). An analogous provision of Pennsylvania law, made applicable to bankruptcy through 11 U.S.C. § 544(b)(1), contains a similar definition of actual fraudulent transfers. 12 Pa. Cons. Stat. § 5104(a)(1) (effective 1993).

The Trustee has brought both federal and state fraudulent transfer claims, which differ in their limitations periods and defenses. The statute of limitations is longer for the state claims, but the Pennsylvania statute provides a good-faith defense that is more favorable to Defendants.

2.    Preferences

Preference law allows the Trustee to avoid certain transfers that were made close in time to the filing of a bankruptcy petition. Generally speaking, and subject to certain requirements and exceptions not at issue here, an avoidable preference is a payment by the debtor to a creditor on account of an antecedent debt during the 90 days preceding the bankruptcy petition, provided the debtor was insolvent and the payment gave the creditor more than they would have received in a liquidation of the debtor's estate. § 547(b). The Bankruptcy Code makes these payments avoidable to "deter[] the failing debtor from treating preferentially its most obstreperous or demanding creditors" and to "discourage[e] the creditors from racing to dismember the debtor." In re Molded Acoustical Prod., Inc., 18 F.3d 217, 219 (3d Cir. 1994).

**B.    Defenses Raised as to Avoidability**

When a bankruptcy trustee sues to recover an avoidable transfer, the defendant can raise defenses both to the avoidability of the transfer and the recoverability of the assets. This section discusses defenses to avoidability that Defendants have raised in this case.

1.    Good Faith (Fraudulent Transfer)

All Defendants assert that they took Image Masters' mortgage payments in good faith. For federal fraudulent transfer claims, good faith does not provide a "complete defense" to avoidability, but gives "the transferee … a lien [in the transferred property] to the extent value was given [to the debtor] in good faith." In re Bernard L. Madoff Inv. Sec. LLC, 12 F.4th 171, 182 (2d Cir. 2021) (quoting 5 Collier on Bankruptcy ¶ 548.09 (16th ed. 2021)).[7] The necessary elements

---

[7] Before the Bankruptcy Court, Defendants suggested § 548(c) amounts to a complete defense on the facts of this case, but the Bankruptcy Court did not address that contention, and its Recommendation in that respect is not objected to.

are that the transferee "takes for value" and "in good faith." 11 U.S.C. § 548(c). By contrast, Pennsylvania law is more favorable to the defendant as it provides a complete defense to a transferee who takes "in good faith" and "for a reasonably equivalent value given the debtor." 12 Pa. Cons. Stat. § 5108(a).

There is no good faith defense to the avoidability of a preference claim. <u>See</u> 11 U.S.C. § 547; <u>In re Spinnaker Indus., Inc.</u>, 328 B.R. 755, 762 (Bankr. S.D. Ohio 2005). A separate good faith defense to recovery of assets from a subsequent transferee is discussed below.

### 2.   Ordinary Course of Business

The First-Level Defendants have raised the "ordinary course of business" defense to the Trustee's preference claims. This defense makes an otherwise preferential transfer not avoidable if it was of a debt that was incurred and satisfied in the "ordinary course of business" of the debtor and transferee and "made according to ordinary business terms." 11 U.S.C. § 547(c)(2). The First-Level Defendants argue that this defense applies to Image Masters' payments because they were ordinary, timely payments on legitimate home mortgage loans.

### 3.   Subsequent New Value

The subsequent new value defense allows an entity who received a preferential payment to offset its liability against money or other value it (or the creditor for whose benefit the payment was made) gave back to the debtor. 11 U.S.C. § 547(c)(4). Here, the homeowners continued to send Image Masters periodic checks, some of which were sent subsequent to Image Masters' mortgage payments. The First-Level Defendants have raised the subsequent new value defense with respect to the homeowners' payments.

4.      Securities Safe Harbor

The Bankruptcy Code provides an exception to avoidability for certain transfers made in connection with "securities contracts," a broadly defined term that includes, among other things, contracts that transfer interests in mortgages. 11 U.S.C. §§ 546(e), 741(7). The exception does not apply to actual fraudulent transfers, but it does apply to preferences. § 546(e). The GSEs (Fannie Mae and Freddie Mac) have raised this defense based on the "securitization trusts" they set up to pool purchased loans for investors, which they argue qualify as "securities contracts."

C.      Recovering Avoided Transfers

Once a transfer has been determined to be avoidable, and the above defenses related to avoidability have been overcome, issues arise as to how, and from whom, the Trustee may recoup the transferred value.

1.      Entities Liable to Return Avoidable Transfers

In general, when a transfer is avoidable, the Trustee may recover "the property transferred" or "the value of such property" from "the entity for whose benefit such transfer was made," "the initial transferee," or "any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a). Transferees in the last category ("immediate or mediate" transferees) are referred to as "subsequent transferees" to distinguish them from the "initial transferee."

A question can arise whether an entity is a "transferee" if its role was limited to taking temporary custody of the funds for the sole purpose of giving them to another entity. See Bonded Fin. Servs., Inc. v. Eur. Am. Bank, 838 F.2d 890, 893 (7th Cir. 1988). Such intermediaries are referred to as "mere conduits." The First-Level Defendants, as well as the GSEs, argue they were mere conduits and not transferees because they were contractually obligated to forward all mortgage payments from Image Masters to other entities.

2.  <u>Good Faith (Recovery from Subsequent Transferees)</u>

When a transfer is avoidable, a subsequent transferee—but not the initial transferee—can escape liability if it took the transfer "for value," "in good faith," and "without knowledge of the voidability of the transfer." 11 U.S.C. § 550(b). This is a separate good faith defense from the one discussed above, and, because it is a defense to recoverability, it applies to both the Trustee's fraudulent transfer claims and preference claims. The GSEs raise this defense, arguing they were subsequent transferees because they received Image Masters' payments from the First-Level Defendants and that they took in good faith because they were unaware of Image Masters' Ponzi scheme.

The other Second-Level Defendants (BNY, Park Granada, and Wells Fargo Bank) only raised good faith as to the avoidability of fraudulent transfers (under 11 U.S.C. § 548(c) and 12 Pa. Cons. Stat. § 5108(a)) and did not raise a good faith defense to liability under § 550(b). However, the Bankruptcy Court granted them summary judgment on a § 550(b) good faith defense because the underlying facts are the same. The Trustee does not object to the Bankruptcy Court extending the § 550(b) defense to Defendants who raised only a § 548(c) defense—other than that the Trustee maintains the defense fails on the facts, is not supported as to preference claims, and is inapplicable to any Second-Level Defendant who was not a subsequent transferee.

## IV.  **PROCEDURAL HISTORY**

The procedural history of this long-running case is complex. This Opinion discusses only those portions pertinent to addressing the parties' objections to the Bankruptcy Court's Report and Recommendation.

The Trustee commenced this lawsuit as an adversary proceeding in the Bankruptcy Court in 2009. Defendants then moved to dismiss, and the Bankruptcy Court granted their motion. On

appeal to this Court, I affirmed in part and reversed in part. <u>Image Masters, Inc. v. Chase Home</u> <u>Fin.</u> (<u>In re Image Masters, Inc.</u>), 489 B.R. 375, 380 (E.D. Pa. 2013). As relevant here, I agreed with Defendants that the Trustee could not bring claims for "constructive" fraudulent transfers because Image Masters received "reasonably equivalent value" each time it sent a mortgage payment. <u>Id.</u> at 389-90. However, I allowed the Trustee's claims for "actual" fraudulent transfers to proceed, based primarily on authority that payments made in connection with a Ponzi scheme are fraudulent because they induce investors to believe the scheme is profitable and thereby maintain or increase their investments. <u>Id.</u> at 392-95. I also determined that, while Defendants had satisfied the "for value" element of their good faith defense, it could not be determined at the pleadings stage whether they were on notice of Image Masters' Ponzi scheme. <u>Id.</u> at 391-92. Certain disputes, not relevant here, regarding joining the homeowners as parties were also addressed. <u>Id.</u> at 395-99. The case was remanded to the Bankruptcy Court.

Soon after remand, the Trustee asked to move the case back to this Court based on the Supreme Court's then-recent decision in <u>Stern v. Marshall</u>, 564 U.S. 462 (2011), which limited the power of bankruptcy courts to adjudicate damages lawsuits brought by bankruptcy trustees. I agreed with the Trustee that her claims were outside the Bankruptcy Court's ultimate jurisdiction, but determined that the case should remain with the Bankruptcy Court for proposed findings of fact and conclusions of law, subject to de novo review in this Court, pursuant to 28 U.S.C. § 157(c)(1). <u>Feldman v. ABN AMRO Mortg. Grp. Inc.</u> (<u>In re Image Masters, Inc.</u>), 515 B.R. 443, 449-52 (E.D. Pa. 2014). Defendants made a similar request in 2019 (this time with the Trustee opposing it), but I again determined that the case should remain with the Bankruptcy Court. <u>Feldman v. ABN AMRO Mortg. Grp., Inc.</u> (<u>In re Image Masters, Inc.</u>), No. 19-mc-131, 2020 WL

618604, at *7 (E.D. Pa. Feb. 10, 2020). During the course of those proceedings, the Trustee settled with some Defendants, who have been dismissed from the case.

All remaining Defendants moved for summary judgment, arguing they are not liable to return Image Masters' mortgage payments for multiple reasons. The Bankruptcy Court issued a Report and Recommendation mostly favorable to Defendants. (ECF No. 410 in 09-ap-2092.) The Bankruptcy Court ruled that all Defendants (except SunTrust) received Image Masters' payments in good faith. While noting that certain communications could have raised "red flags" about Image Masters' business, the Bankruptcy Court viewed these irregularities as miniscule compared to the volume of mortgage payments Defendants regularly processed, meaning they were not responsible for connecting the dots and realizing the payments could be fraudulent. The exception was SunTrust: the Bankruptcy Court observed that there were more red flags for SunTrust's mortgages than the others, and thus found a disputed fact as to whether SunTrust acted in good faith. As to the Second-Level Defendants (who did not receive any red flags directly), the Bankruptcy Court determined that the Trustee had forfeited any argument that they were constructively on notice under an agency theory by not pleading such a theory in the complaint.

The Bankruptcy Court also agreed with the First-Level Defendants and the GSEs (Fannie Mae and Freddie Mac) that they were never "transferees" of Image Masters' payments, instead merely "conduits" who sent the payments along to other entities. They were therefore not liable to return those payments.

Certain issues specific to preference claims were also addressed. On the "ordinary course of business" defense, the Bankruptcy Court determined that Defendants were not entitled to summary judgment because Image Masters' fraudulent scheme was not "ordinary." But the Bankruptcy Court found the "subsequent new value" defense potentially applicable (barring

certain issues with Defendants' calculations), rejecting the Trustee's argument that payments from the homeowners should not count to offset Defendants' liability.

Finally, the Bankruptcy Court decided that the GSEs were not protected by the securities safe harbor because Image Masters' payments were not made "in connection with" the GSEs' securitization trusts.

All parties filed objections to portions of the Bankruptcy Court's Report and Recommendation. Those objections are now before me.

## V.     **LEGAL STANDARD**

My review of the Bankruptcy Court's Report and Recommendation is de novo. 28 U.S.C. § 157(c)(1). Accordingly, I apply the same summary judgment standard applied by the Bankruptcy Court.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if there is evidence from which a reasonable factfinder could return a verdict for the non-moving party, and a dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

## VI.    DISCUSSION

### A.    Good Faith as to Fraudulent Transfer Claims[8]

The Trustee objects to the Bankruptcy Court's recommendation that all Defendants other than SunTrust received Image Masters' payments in good faith. SunTrust objects to the recommendation that a factual dispute existed as to its good faith.

For the reasons set out below, I conclude that all Defendants, including SunTrust, received Image Masters' payments in good faith. While I agree with the Bankruptcy Court that there were "red flags" associated with Image Masters' payments, the Bankruptcy Court improperly applied

---

[8] Good faith as to preference claims is discussed near the end of this Opinion.

the standard for inquiry notice, in particular the relevance of futility. A duty to inquire does not amount to notice of the voidability of a transfer unless an inquiry would have shown the transfer to be voidable. In re Bressman, 327 F.3d 229, 236 (3d Cir. 2003). Applying that standard, I conclude that the undisputed facts show that an inquiry would not have revealed facts sufficient to alert Defendants that Image Masters' payments were voidable. For that reason, I find that all Defendants took Image Masters' payments in good faith.[9]

        1.     <u>Standard</u>

To make out a good faith defense, the transferee must take: (1) for value, (2) in good faith, and (3) without knowledge of the voidability of the transfer. 11 U.S.C. §§ 550(b)(1), 548(c); 12 Pa. Cons. Stat. § 5108(a).[10] As the Bankruptcy Court recognized, my Opinion on Defendants' motion to dismiss established that all Defendants took "for value." Authority differs on whether the latter two elements have distinct meaning—that is, whether "good faith" requires more than merely being unaware that the transfer is voidable. See Bonded Fin. Servs., Inc. v. Eur. Am. Bank, 838 F.2d 890, 897 (7th Cir. 1988). Here, the Trustee's objections relate only to whether Defendants were on notice of Image Masters' Ponzi scheme, and thus I need not address whether the term "good faith" might entail other requirements.

---

[9] The implications of a good faith defense differ depending on whether the defendant is an initial or subsequent transferee. In addition, because the state and federal fraudulent transfer provisions have different good faith defenses and different statutes of limitations, the effect of a good faith defense differs depending on when the transfer occurred in relation to Image Masters' bankruptcy filing. As discussed later in this Opinion, it is disputed which Defendants were initial transferees and which may have been subsequent transferees. Accordingly, this Opinion discusses only whether Defendants acted in good faith, and the implications of any good faith defense will depend on Defendants' transferee status.

[10] The requirement of "without knowledge" is omitted from § 548(c) and the Pennsylvania statute, but I need not decide whether this affects the analysis.

"[A] transferee has knowledge if he knew facts that would lead a reasonable person to believe that the property transferred was recoverable." In re Bressman, 327 F.3d 229, 236 (3d Cir. 2003) (quotation marks omitted). This standard does not require the transferee to have a "complete understanding of the facts … ." Bressman, 327 F.3d at 236. But the transferee has to be aware of something more specific than merely "some infirmity" in the transferor's business. In re Bayou Group, LLC, 439 B.R. 284, 290 (S.D.N.Y. 2010). "Simply because a debtor conducts its business fraudulently does not make every single payment by the debtor subject to avoidance." In re Carrozzella & Richardson, 286 B.R. 480, 489 (D. Conn. 2002). Thus, the inquiry must focus on information "specific to the transfer at issue" rather than "the transferor's activities in general." Bayou Group, 439 B.R. at 311. Typically, sufficient knowledge consists of facts "suggesting insolvency or a fraudulent purpose in making a transfer." Id. at 314.[11]

A transferee may have "knowledge" of the voidability of a transfer through the doctrine of "inquiry notice." Under that doctrine, "[i]f a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable," "the transferee is held to have knowledge of the voidability of the transfer." Bressman, 327 F.3d at 236. In determining what inferences are reasonable, a court may look to "the customary practices of the industry in which the transferee operates." In re Nieves, 648 F.3d 232, 240 (4th Cir. 2011). But inquiry notice "is not the same as a duty to investigate … ." Bressman, 327 F.3d at 237. "A transferee that lacks the information necessary to support an inference of knowledge need not start investigating on his own." Id.

---

[11] The parties dispute whether the standard under Pennsylvania law is also objective or whether it uses a more defendant-friendly subjective standard. Because, for the reasons discussed below, I find that all Defendants acted in good faith under the objective standard, and it is undisputed that no Defendant was subjectively aware of Image Masters' Ponzi scheme, I need not decide what standard applies to the Pennsylvania statute.

"Rather, the issue is whether the facts known to the [transferee] and the reasonable inference to be drawn from those facts would affirmatively suggest to a reasonable person in their position that they were receiving assets [recoverable by] the estate. If not, there would be no duty to investigate." Id.

For example, in Bressman, the bankruptcy trustee himself communicated to the transferees "that he was investigating whether they were being paid from estate assets and would seek to recover them if his investigation revealed that they were." 327 F.3d at 237. This was not enough for inquiry notice because "[c]onducting an investigation" is the ordinary responsibility of a bankruptcy trustee, and the mere fact an investigation is occurring "does not suggest that any particular asset is recoverable[.]" Id. at 239. By contrast, in Nieves, the transferee was on inquiry notice when it learned facts suggesting the transferor was not a real legal entity and a public records search would have revealed the transfer "was made for zero consideration shortly before the Debtor filed for bankruptcy." 648 F.3d at 242.

Once a defendant is aware of facts that would lead a reasonable person to inquire, notice extends to all facts that a "further inquiry … would [have] reveal[ed]." Bressman, 327 F.3d at 236. Thus, if an "inquiry would have turned up nothing pertinent to voidability, the [defendant's] failure to make it does not permit a court to attribute to it the necessary knowledge." Bonded Fin. Servs., Inc. v. Eur. Am. Bank, 838 F.2d 890, 898 (7th Cir. 1988).

The Trustee argues, and the Bankruptcy Court agreed, that where a defendant neglects its duty to inquire, it should not be excused from liability merely because the foregone investigation would have been futile. The Trustee acknowledges the Third Circuit's statement in Bressman that inquiry notice extends only to what an inquiry would have revealed, but argues that this statement was dictum because no duty to inquire arose in that case, and, thus, the scope of any potential

inquiry was irrelevant.[12] The Trustee asks me to instead follow <u>SEC v. Forte</u>, No. 09-cv-63, 2012 WL 1719145 (E.D. Pa. May 16, 2012), which distinguished <u>Bressman</u> and held that "a transferee who ignored storm warnings of wrongdoing, and who failed to investigate," could not "show he acted in good faith if a diligent investigation would not have uncovered the fraudulent scheme." <u>Id.</u> at *7.

However, <u>Forte</u> only distinguished <u>Bressman</u> because it dealt with a state law that employed a subjective good-faith standard, under which only "willful or reckless blindness" could substitute for actual knowledge. <u>See id.</u> In contrast, the standard under the Bankruptcy Code is objective and looks to what a "further inquiry … would [have] reveal[ed]." <u>Bressman</u>, 327 F.3d at 236. Moreover, while the Trustee may be correct that references to futility in <u>Bressman</u> were not dispositive on the facts of that case, other controlling authority outside the fraudulent transfer context offers a "general articulation" of inquiry notice that is "fairly consistent" across all areas of law. <u>Mathews v. Kidder, Peabody & Co.</u>, 260 F.3d 239, 251 (3d Cir. 2001). Under that general articulation, inquiry notice extends only to what an inquiry would have uncovered. <u>See id.</u> ("In the context of a RICO action predicated upon a securities fraud claim, … a plaintiff is on inquiry notice whenever circumstances exist that would lead a reasonable investor of ordinary intelligence, through the exercise of reasonable due diligence, <u>to discover his or her injury</u>." (emphasis added)); <u>Merck & Co. v. Reynolds</u>, 559 U.S. 633, 652-53 (2010) (for securities fraud statute of limitations,

---

[12] The full statement from <u>Bressman</u> reads:

> If a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, <u>and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable</u>, he cannot sit on his heels, thereby preventing a finding that he has knowledge. In such a situation, the transferee is held to have knowledge of the voidability of the transfer.

<u>Bressman</u>, 327 F.3d at 236 (emphasis added).

notice begins when "a reasonably diligent plaintiff would have discovered the facts constituting the violation" (emphasis added, quotation marks and alterations omitted)); Shauer v. Alterton, 151 U.S. 607, 622 (1894) (in fraudulent transfer case, notice requires "facts as were sufficient to put a prudent person upon an inquiry that would have disclosed the existence of [fraudulent] intent upon the part of the vendor" (emphasis added)); id. (notice extends to "everything to which such inquiry might have led" (emphasis added)). For these reasons, I conclude that, if a reasonable inquiry into the proffered red flags would not have revealed facts suggesting that Image Masters' payments were voidable, Defendants acted in good faith.

### 2.      Analysis—Fraudulent Transfer Claims

Although good faith is an affirmative defense on which the defendant bears the burden of proof, Image Masters, 489 B.R. at 391, a defendant may still obtain summary judgment by showing "credible evidence that would entitle [it] to a directed verdict if not controverted at trial," provided the plaintiff is unable to rebut it with "probative evidence that would demonstrate the existence of a triable issue of fact." Bressman, 327 F.3d at 238. This may be accomplished through a "denial of relevant knowledge" with "substantial corroborating evidence in the record" and no "contrary evidence." Id.

The Bankruptcy Court took it as undisputed that all Defendants lacked actual knowledge of Image Masters' Ponzi scheme and analyzed only whether the Trustee had pointed to sufficient evidence of "red flags" to raise a dispute of fact as to their constructive notice. (Revised R&R at 46-47, 63-72.) The Trustee does not object to that analytical framework. (See Trustee's Objections at 25-26.)

> a) Material Disputed Facts Exist Regarding Whether "Red Flags" Would Have Led a Reasonable Mortgage Lender to Inquire into Some Aspects of Image Masters' Payments

A factfinder could conclude that address changes, third-party payments, and borrower confusion warranted further inquiry. Address changes could reasonably be viewed as suspect because they came immediately after new mortgages on owner-occupied homes, raising questions as to the borrowers' identities or the occupancy status of the collateral. The same could be said of borrower confusion—some homeowners did not even know they had a mortgage with the applicable lender. While it is less obvious how third-party payments suggested fraud, the Trustee's expert opines this was well-known in the industry, and the Bankruptcy Court's ruling admitting this testimony over a <u>Daubert</u> challenge has not been objected to. Thus, there are sufficient facts to establish that a reasonable lender would have inquired into at least some payments for some mortgages.

The First-Level Defendants disagree with this point, primarily relying on their size and noting that they processed millions of other mortgage payments during Image Masters' time. These Defendants assert that spotting irregularities in payments from Image Masters would have been like spotting a needle in a haystack. The Bankruptcy Court adopted that reasoning as to all First-Level Defendants except SunTrust. While I agree that a factfinder could view Defendants' size as relevant, I do not agree that it forecloses all dispute at the summary judgment stage. A factfinder could equally conclude that a well-funded, reasonable lender would have devoted resources adequate for the size of its operations. Cf. <u>In re Nordic Vill., Inc.</u>, 915 F.2d 1049, 1056 (6th Cir. 1990), <u>rev'd on other grounds</u>, 503 U.S. 30 (1992) ("[T]here is nothing in size or complexity that should lessen the obligation to observe circumstances giving notice that something might be wrong with accepting a check."). In addition, Defendants' concern about being held liable for missing the needle in a haystack is overstated. No one is suggesting Defendants should be liable for the entire

haystack (i.e., non-Image Masters payments) for failing to spot a single needle; if they are liable, their exposure would be commensurate with the needle they failed to spot.

I therefore conclude there is a dispute of fact as to whether a reasonable mortgage lender in the position of the First-Level Defendants would have inquired into the red flags raised by Image Masters' mortgage payments (address changes, third-party payments, and borrower confusion).

> b) The Undisputed Facts Establish That a Reasonable Inquiry Would Not Have Revealed Image Masters' Payments to Be Voidable

Because a factfinder could conclude that a reasonable bank would have inquired further into the red flags, the next question is what that inquiry would have uncovered. If such an inquiry would not have shown Image Masters' payments to be voidable, good faith will be established. Bonded Financial, 838 F.2d at 898. "Voidable" in this case means that the payments were fraudulent transfers—i.e., payouts from a Ponzi scheme. Thus, the question is whether a reasonable inquiry would have revealed that Image Masters was satisfying obligations to earlier clients with investments from later clients—e.g., through a Ponzi scheme.

The analysis is made more difficult by the fact that the Trustee has not explained what inquiry, in her view, a reasonable lender would have pursued. The Trustee's brief in opposition to summary judgment only states that Defendants could have "easily" uncovered the Ponzi scheme. (ECF No. 358 in 09-ap-2092.) And the Trustee's expert testified that the nature of any investigation was up to the lenders' "discretion." (Scherf Dep. (Countrywide Ex. 2, ECF No. 305-5) at 175:14-22.) Although the Trustee's expert identified the documents that would have shown Image Masters' return-on-investment, the Trustee has not explained why Defendants' inquiry would have included Image Masters' return-on-investment or what Image Masters' return-on-investment had to do with any of the red flags.

Turning to the specific red flags, the Trustee's expert concedes that none of them were fraudulent in themselves or "specifically indicate[d]" a Ponzi scheme. (Scherf Report at 14-15; Scherf Dep. (Citi's Ex. 30) at 344:16-21.) Thus, unlike <u>Nieves</u>, this is not a case where a public records search could have revealed facts suggesting an effort to hide assets from creditors. 648 F.3d at 242. Had Defendants actually inquired into the red flags, they would have found that the homeowners had authorized Image Masters to take the relevant actions. For example, regarding the address change notifications, Defendants would have discovered that the homeowners had actually executed those documents, and there was no fraud in the ownership or occupancy status of the homes. Similarly, the homeowners had legitimately authorized Image Masters to take out loans on their behalf and undertake the payment obligations. (Citi Facts ¶¶ 16, 20; Countrywide Facts ¶¶ 18-19; Scherf Report at 4, 19; Pawlowski Report at 6; Third Amended Complaint ¶¶ 48-50.) In other words, none of the possible defects indicated by the red flags noted above actually existed—the fraud lay elsewhere.[13]

Courts have found that where a "red flag" indicates a possible unauthorized transfer, and an inquiry would have revealed that the transfer was in fact authorized, the transferee is not on inquiry notice that the transfer may have been voidable for other, unrelated reasons. <u>Bonded Financial</u>, 838 F.2d at 898; <u>In re First Indep. Cap. Corp.</u>, 181 F. App'x 524, 530 (6th Cir. 2006); <u>Wiand v. Wells Fargo Bank, N.A.</u>, 86 F. Supp. 3d 1316, 1330 n.12 (M.D. Fla. 2015). In <u>Bonded Financial</u>, a corporate officer transferred $200,000 from the corporation to himself and then to a

---

[13] The Trustee's other expert also faults Defendants for not investigating "the borrower's occupancy of the subject property," but the borrowers did, in fact, occupy the subject properties. (Pawlowski Report (Trustee's Ex. 6) at 17.) Even farther afield, this expert criticizes Defendants for accepting change-of-address documents with inconsistent dates or that did not use the banks' own forms—but, again, the homeowners did in fact execute the change-of-address documents, and thus such an inquiry would have been pointless. (Pawlowski Report at 17-18.)

lender on the eve of the corporation's bankruptcy. 838 F.2d at 891. In finding that the lender took the payment in good faith, the court observed that the lender was at most aware of facts that could "hint at embezzlement," a concern that ultimately proved unfounded. Id. at 898. And "[h]ad the Bank called [the corporation] to inquire about the [$200,000] check, the Bank would have learned that the instrument was authorized by the appropriate corporate officials." Id. at 898. Similarly, First Independence Capital Corp. found good faith where a corporate insider withdrew cash on the eve of bankruptcy and an inquiry would have revealed that the withdrawals were authorized. 181 F. App'x at 529-30. Most similar to the present case, the debtor in Wiand operated a Ponzi scheme, and the debtor's receiver sued to recover payments the debtor had made to a bank. The receiver argued the bank lacked good faith because it was aware of the debtor's "large transactions," but the court concluded any further inquiry would have been futile as it would have revealed, at most, that the transactions were authorized by entities under the debtor's control, with no facts indicating a Ponzi scheme. 86 F. Supp. 3d at 1330 n.12.

The same reasoning applies here: the red flags could have been suspect because a lender viewing them might have been concerned that the homeowners had not authorized the loans. But those concerns were unfounded. And, importantly, the flags gave no indication that Image Masters was conducting a Ponzi scheme. Because that is the sole reason Image Masters' payments were voidable, and investigating the red flags would not have uncovered it, Defendants were not on notice that the transfers were voidable.

Finally, the Trustee's expert suggests a good faith defense does not hold because some of the red flags were consistent with "equity skimming," a type of fraud in which a broker charges unnecessary fees to steal the homeowner's equity. But that expert has not opined that the red flags indicated equity skimming or that equity skimming actually occurred here. (Scherf Report at 12-

13.) And, in any event, no argument has been made that payments by a broker engaged in equity skimming (unlike payouts from a Ponzi scheme) are avoidable as fraudulent transfers. See In re Sharp Int'l Corp., 403 F.3d 43, 56 (2d Cir. 2005) (finding investor payout not a fraudulent transfer despite substantial non-Ponzi scheme fraud in debtor's business).

For these reasons, the undisputed facts show that a reasonable inquiry would not have shown Image Masters' mortgage payments to be voidable as fraudulent transfers. Defendants are, accordingly, entitled to a summary judgment ruling that they took all payments in good faith as to the Trustee's fraudulent transfer claims.[14]

### B.    "Transferee" and "Conduit" Status

Image Masters sent mortgage payments on behalf of the homeowners to the First-Level Defendants, who, in turn, sent them to the Second-Level Defendants. Two Second-Level Defendants, the GSEs (government-sponsored enterprises) Fannie Mae and Freddie Mac, sent those payments to investors in "securitization trusts." The First-Level Defendants and the GSEs argue they are not liable to return Image Masters' payments because they were not "transferees" of those payments, only "mere conduits."

When a debtor makes an avoidable transfer, the bankruptcy trustee may recover the money from "the entity for whose benefit such transfer was made," "the initial transferee," or "any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a). Thus, in the

---

[14] As noted, the consequences of that ruling, which are not the subject of the parties' objections (other than as to subsequent transferee status), may depend on the timing of payments and on which Defendants were initial transferees.

Because I conclude the First-Level Defendants were not on notice that Image Masters' payments were voidable, I need not discuss the Trustee's agency theory or whether it was forfeited. I also need not address the GSEs' argument that the agency theory is inapplicable to them because they are quasi-government entities.

ordinary case, when the debtor sends an avoidable payment to A, who sends it to B, who sends it to C, all three transferees (A, B, and C) are potentially liable to return the money—not just the one who ended up with it. In re Bernard L. Madoff Inv. Sec. LLC, 515 B.R. 117, 149 (Bankr. S.D.N.Y. 2014).

However, while there is no binding authority in the Third Circuit, every court to have considered the issue has decided that certain entities who merely "touch[] the money" en route to its final destination are not "transferees" and thus are exempted from the chain of potential liability. Bonded Fin. Servs., Inc. v. Eur. Am. Bank, 838 F.2d 890, 894 (7th Cir. 1988). For example, an armored car driver or a bank who only cashes a check, although having temporary custody of the funds, are not "transferees" because the transferor has given them the money only for the limited purpose of giving it to someone else, pursuant to specific instructions. Id. at 893. Such entities are referred to as "mere conduits." Id. at 891.

In theory, deciding who is a transferee and who is a conduit does not affect the ability of the trustee to recover the money. Conduit status only changes the identity of the proper defendant from whom the money should be sought. That is because the first non-conduit in the chain will be an initial transferee and thus strictly liable. See In re Brooke Corp., 458 B.R. 579, 590-91 (Bankr. D. Kan. 2011). However, if Defendants' conduit claims here are accepted, the Trustee would have to pursue Image Masters' payments all the way to the GSEs' securitization trusts, their investors, or beyond—entities who may be diverse in number or not identifiable within the statute of limitations. This is similar to the situation in Paloian v. LaSalle Bank, N.A., 619 F.3d 688 (7th Cir. 2010), where the argument was made (and rejected) that the trustee should have to chase down the debtor's payments from innumerable investors in a "securitization pool," despite the debtor having

paid only the pool's trustee. Id. at 691-92. Thus, as a practical matter, who is considered a "transferee" versus a "conduit" may affect the ability of the Trustee to recover the money at all.

The parties here agree that the statute should be interpreted to exempt mere conduits from liability as transferees, and also agree, in broad terms, that a "mere conduit" is someone who lacks "dominion and control" over the funds temporarily entrusted to them. In re C.F. Foods, L.P., 265 B.R. 71, 78 (Bankr. E.D. Pa. 2001). Applying the dominion and control test is straightforward in cases where it is clear who the debtor intended to pay. Thus, for example, if the debtor gives money to A for the sole purpose of giving it to B pursuant to the debtor's instructions, A is a conduit and not a transferee. But if the debtor gives money to A to pay the debtor's own debt to A, and A subsequently uses the money to pay its own debt to B, A is a transferee and not a conduit. In re FBI Wind Down, Inc., 614 B.R. 460, 501 (Bankr. D. Del. 2020).

As an example of the latter situation, a business may contract with a staffing agency for workers, wherein the business pays the staffing agency, and the staffing agency pays the workers. Even though most payments from the business to the staffing agency are immediately turned over to the workers as wages, the staffing agency is still a transferee and not a conduit. In re Cypress Restaurants of Georgia, Inc., 332 B.R. 60, 65 (Bankr. M.D. Fla. 2005). This is because the business pays the staffing agency to satisfy its own debts to the staffing agency, and, in paying the workers, the staffing agency is using the funds for its own purposes, not the business's purposes. See id.

A more difficult situation occurs where the first party to receive the money has taken some action that purports to make the debtor's own obligation run to a third party. By way of example, suppose the debtor owes a debt to A, and A purports to transfer or assign its ownership in the debt to B, after which the debtor sends another loan payment to A. If the debtor is aware of the assignment and has the right to instruct A how to dispose of the payment, and uses that authority

to require A to forward the payment to B, it reasonably follows that A is a conduit because it handles the money for the limited purpose of following the debtor's instructions. But if the debtor is either unaware of the assignment or remains obligated to send its payments to A, and does so, the foregoing logic no longer holds, because the debtor now purports to pay A to fulfil an obligation owed to A—i.e., the debtor "transfers" the money to A, not to B. See In re Columbia Data Prod., Inc., 892 F.2d 26, 28 (4th Cir. 1989) (finding assignor of loan not a conduit where it continued to be "the party with whom the debtor had a business relationship").

That scenario is similar to what occurred here: the First-Level Defendants sold their rights in the loans to the Second-Level Defendants, but there is no evidence that the homeowners or Image Masters were aware of those sales, or that they could pay the Second-Level Defendants directly or require the First-Level Defendants to dispose of the funds in any particular way. In fact, the Trustee's evidence suggests that Image Masters continued to send mortgage payments to the First-Level Defendants who, per their servicing contracts, sent the payments to the Second-Level Defendants.

In the First-Level Defendants' view, they were conduits because the Second-Level Defendants had purchased the homeowners' debts, obligating the First-Level Defendants to send along any payments they received. The Bankruptcy Court agreed, holding the First-Level Defendants were conduits because they were not free to use Image Masters' payments as they wished and thus lacked "dominion and control" over them. The Bankruptcy Court did not view it as significant that the First-Level Defendants' obligations to pass on the payments arose from their own downstream relationships with the Second-Level Defendants. But, importantly, there is no evidence that those relationships included Image Masters or the homeowners.

The Trustee objects to this reasoning, asserting that when Image Masters sent a mortgage payment to a First-Level Defendant, it was fulfilling an obligation owed by the homeowner directly to that First-Level Defendant, and that Image Masters was not asking or directing the First-Level Defendant to send the payment to anyone else. In the Trustee's view, an entity who receives a payment in satisfaction of an obligation owed to it cannot be a conduit regardless of how it disposes of the funds on the backend.

Precedent addressing analogous situations is mixed. Cases favoring the Trustee reason that where the debtor sends a payment to "the party who had a direct business relationship" with it, that party is a transferee, irrespective of any "independent" obligations the party may have had to downstream entities. In re Appalachian Finishing Works, 244 B.R. 771 (Bankr. E.D. Tenn. 2000); see also In re Erie Marine Enterprises, Inc., 216 B.R. 529, 536 (Bankr. W.D. Pa. 1998) (similar reasoning); In re Am. Hous. Found., 518 B.R. 386, 392 (Bankr. N.D. Tex. 2014). These cases observe that when the debtor sends money in satisfaction of its own obligation to the recipient, the money is not "earmark[ed]" for downstream entities, so the recipient is not following the debtor's instructions on how to dispose of it. Appalachian Finishing, 244 B.R. at 775-76. The initial recipient might choose to honor its downstream commitments, but those are its own purposes, not the debtor's, whose purpose is simply to pay its own debt. Columbia Data Prod., 892 F.2d at 29. Furthermore, initial and subsequent transferees are able to allocate the risk of an avoided payment among themselves, and it is thus not unfair to hold an initial transferee liable to return a payment it has already sent to another entity. Paloian, 619 F.3d at 692.

Cases favoring Defendants tend to focus less on who the debtor transfers the money to (as the statutory term "transferee" directs) and more on whether the recipient had a "right," in an abstract sense, to keep the money. In re Gen. Mortg. Corp. of Am., Inc., 384 B.R. 617, 620-21

(Bankr. M.D. Fla. 2008); <u>In re Brooke Corp.</u>, 458 B.R. 579, 588 (Bankr. D. Kan. 2011). Thus, if the initial recipient had a downstream commitment to pass the money on, these cases reason that the recipient "had no legal right to use the funds for its own purposes." <u>Gen. Mortg.</u>, 348 B.R. at 620-21.

After reviewing this precedent as it relates to the undisputed facts before me, I conclude that the Trustee's view is more consistent with the Bankruptcy Code and policy considerations. The Bankruptcy Code uses the terms "transfer" and "transferee" and therefore instructs courts to examine who the debtor sent the money to.[15] The Code does not speak to what happened to the money afterward or even who ultimately owned the debt that was paid. 11 U.S.C. § 550(a). While following the money to its ultimate destination may have intuitive appeal, it is not the scheme Congress set up, which makes both the "initial transferee" and any "immediate or mediate transferee" potentially liable. <u>Id.</u> Thus, if the debtor sends money to A purporting to satisfy an obligation owed to A, A is an "initial transferee," irrespective of the ultimate holder of the debt or any backend obligation to pass the money along to someone else. If A happens to use received funds to satisfy an obligation it has created, it is using the funds for its own purposes, not the debtor's purposes, and so it remains a transferee. <u>Columbia Data Prod.</u>, 892 F.2d at 29.

---

[15] The full subsection reads:

> Except as otherwise provided in this section, to the extent that a <u>transfer</u> is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> (1) the <u>initial transferee of such transfer</u> or the entity for whose benefit such transfer was made; or
>
> (2) <u>any immediate or mediate transferee</u> of such initial transferee.

11 U.S.C. § 550(a) (emphasis added).

Defendants' view, which is that an obligation to pass on funds makes the recipient a conduit, would largely undo Congress's decision to make every transferee in a multi-step transfer potentially liable. It is unlikely the initial recipient would choose to pass the money along without an obligation to do so, and thus, in the ordinary case of a multi-step transfer, each entity in the chain will be able to claim it was a mere conduit. Congress instructed that, in such case, each entity in the chain is potentially liable, not just the last one. See § 550(a).

Defendants' approach would also create unanticipated and unworkable complexities. The Trustee here sued the First- and Second-Level Defendants because she was able to determine that they received Image Masters' payments. Two of those Defendants, the GSEs, responded with contracts neither Image Masters, the homeowners, nor the Trustee had ever seen before, purporting to direct all payments to numerous investors in "securitization trusts." From the GSEs' briefing, it was unclear whether their claim was that the trusts themselves were the transferees, or whether the Trustee should have followed the money all the way to the trusts' investors or beyond. (See GSEs' Brief, ECF No. 294-9 in 09-ap-2092, at 7 ("The Trustee has never asserted claims against the securitization trusts that actually held the Conventional Mortgages in question and the investors in those trusts who ultimately received and retained the Homeowners' payments."); id. at 24 ("Under the governing trust documents, the GSEs were obligated to forward all monthly payments due under the securitized loans to the ultimate investors holding the certificated interests in the applicable trust." (emphasis added)).) If the latter, the GSEs have not clarified who those investors were, but have suggested that they included some of the First-Level Defendants in this case, bringing the money trail full circle. (See GSEs' Ex. D ¶ 5 n.2.) If, on the other hand, it was the trusts that should have been sued, the GSEs have never explained what type of legal entities those

trusts were or why the trusts could not have asserted an equally valid conduit defense.[16] None of these complexities appear in the text of the statute, and I decline to infer that Congress buried them in the word "transferee."

Instead, the question that arises from the statutory language is a simple one: Who did the debtor "transfer" the money to? Applied to the facts of this case, none of the Defendants have shown an entitlement to summary judgment. Evidence that Image Masters sent money to the First-Level Defendants as repayments on loans raises an inference, potentially acceptable to a factfinder, that Image Masters "transferred" the money to them.[17] While the First-Level Defendants protest that the loans were actually owed to the Second-Level Defendants, this argument misses the point—namely, who Image Masters paid. The First-Level Defendants have not explained who the homeowners (and by extension Image Masters) were obligated to pay, whether Image Masters instructed the First-Level Defendants how to dispose of the payments, or whether Image Masters was even free to earmark its payments for the loans' ultimate owners. Defendants do not allege, for example, that Image Masters made out checks to "Fannie Mae c/o CitiBank." All that has been established is that the First-Level Defendants had their own downstream obligations to send payments along, which is insufficient to make them conduits. Columbia Data Prod., 892 F.2d at 29.

The analysis is the same for the GSEs. The Trustee's evidence that the GSEs received payments pursuant to servicing contracts raises an inference that the GSEs were transferees of the First-Level Defendants' payments, making them "subsequent transferees" of Image Masters' payments. As with the First-Level Defendants, the GSEs have not shown beyond genuine dispute

---

[16] A trustee holds legal title to trust assets and thus may be sued for them. Paloian, 619 F.3d at 691.

[17] The Trustee has not moved for summary judgment in her favor, and thus I need not decide whether these facts are undisputed.

that the First-Level Defendants actually "transferred" these payments to securitization trusts or investors, only that the GSEs themselves had set up documents directing that the payments be disposed of in that manner.

Summary judgment will therefore be denied to the First-Level Defendants and the GSEs on the issue of whether they were "mere conduits" of Image Masters' payments.[18]

### C.    Actual Fraudulent Transfers

I previously denied Defendants' motion to dismiss the Trustee's actual fraudulent transfer claims and adopted the rule, followed by a majority of federal courts, that payouts from a Ponzi scheme may be inferred to be fraudulent transfers because they encourage creditors to maintain or increase their investments in the scheme. Image Masters, 489 B.R. at 394. At summary judgment, only the GSEs (Fannie Mae and Freddie Mac) renewed their argument that the payments they received were not actually fraudulent. The Bankruptcy Court denied summary judgment on that ground, citing my Opinion on the motion to dismiss.

Objecting to the Bankruptcy Court's recommendation, the GSEs now concede that, under the law of the case, payouts to investors in a Ponzi scheme may be fraudulent transfers "in an appropriate context." (GSEs Objections, ECF No. 413 in 09-ap-2092, at 7.) However, they insist that this rule should not apply to the payments they received because all payments were made pursuant to legitimate home mortgage loans.

---

[18] I need not reach the Trustee's argument that a "mere conduit" must act in good faith, or that the record is insufficiently developed as to when Citi sold its loans. I also need not reach the objection raised by some Defendants to the Bankruptcy Court's recommendation that they were transferees of any "servicing fees" retained. And, because BNY and Park Granada did not move for summary judgment on the conduit issue, I need not address their objection that the issue of retained servicing fees does not apply to them.

I disagree with the GSEs' objection. The investors in Image Masters' Ponzi scheme were its clients, the homeowners. Thus, if Image Masters had paid the homeowners directly, an inference would arise that those payments were fraudulent transfers and summary judgment would clearly have to be denied. The only question is whether it makes a difference that Image Masters paid the homeowners indirectly, by paying the homeowners' own debts.

I conclude that that Image Masters' choice to pay the homeowners' indirectly makes no difference, which follows from the Bankruptcy Code's two-part framework for avoidance actions. A transfer is either avoidable or it is not, and it is not avoidable as to some recipients and unavoidable as to others. In re Sufolla, Inc., 2 F.3d 977, 982 (9th Cir. 1993). When a debtor makes an avoidable transfer by paying the creditor's own debt, the trustee may recover the transferred assets from either: (1) "the entity for whose benefit such transfer was made," i.e. the homeowners; or (2) the "transferee," i.e. Defendants. 11 U.S.C. § 550(a). This two-step system applies in Ponzi scheme cases no less than in other fraudulent transfer cases. See Meoli v. The Huntington Nat'l Bank, 848 F.3d 716, 720 (6th Cir. 2017) (allowing recovery of Ponzi scheme payments sent directly to a creditor of the investor). The initial transferee is strictly liable irrespective of its own lack of involvement in making the transfer voidable. In re Dawley, No. 01-cv-32215, 2005 WL 2077074, at *14 (Bankr. E.D. Pa. Aug. 10, 2005). Congress reasonably determined this was not an unjust result, since innocent transferees "ha[ve] no entitlement to have [their legitimate] claims paid by the proceeds of fraud, as would be obvious if" Image Masters "had picked someone's pocket and given the money found there to" them. Scholes v. Lehmann, 56 F.3d 750, 758 (7th Cir. 1995).

The GSEs insist that repayment of a "legitimate debt" is not a fraudulent transfer, but this again conflates avoidability with recoverability. The rule the GSEs cite is that merely choosing

which of the debtor's <u>own</u> legitimate debts to repay is not fraudulent; it says nothing about whether

a debtor can launder a fraudulent transfer by paying the <u>creditor's</u> debt. <u>See</u> <u>In re Sharp Int'l Corp.</u>,

403 F.3d 43, 56 (2d Cir. 2005). And, while "payment of an actual debt" is not automatically

fraudulent, it also does not "close[] inquiry into the fraudulent intent of such payment," provided

there is "additional evidence" to support it. <u>Werner v. Zierfuss</u>, 29 A. 737, 738 (Pa. 1894); <u>see also</u>

<u>Peoples-Pittsburgh Tr. Co. v. Holy Fam. Polish Nat. Cath. Church, Carnegie</u>, 19 A.2d 360, 361

(Pa. 1941) (payment on debt may be fraudulent if there is "some improper advantage to the debtor

beyond the discharge of his obligation"). Here, the "additional evidence" of fraud is that the

mortgage payments included payouts from a Ponzi scheme.

 For these reasons, summary judgment will be denied to the GSEs as to whether Image

Masters' mortgage payments were fraudulent transfers.

### D. Defenses Specific to Preference Claims

 Defendants also moved for summary judgment based on two defenses specific to

preference claims: "ordinary course of business" and "subsequent new value." The Bankruptcy

Court recommended denying summary judgment on the ordinary course of business defense but

granting it, in part, on the subsequent new value defense. Both recommendations are objected to.

For the reasons set out below, I agree with the Bankruptcy Court's recommendations on both

defenses.[19]

---

[19] The Bankruptcy Court did not fully grant the subsequent new value defense because Defendants'
calculations contained inconsistencies. That finding is not objected to and I therefore do not
address it.

1.     <u>Ordinary Course of Business</u>

A bankruptcy trustee "may not avoid" a preferential transfer if: (1) the transfer paid "a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee"; (2) the payment itself was "made in the ordinary course of business or financial affairs of the debtor and the transferee"; and (3) the payment was "made according to ordinary business terms." 11 U.S.C. § 547(c)(2). This defense is "formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy." <u>In re Molded Acoustical Prod., Inc.</u>, 18 F.3d 217, 219 (3d Cir. 1994).

Under the above statutory terms, the defense will not apply unless the transfer is ordinary in four places: two on the debtor's side (in the way the debt is incurred and paid), and two on the transferee's side (in the way the debt is incurred and paid). Thus, even if the transferee's actions are ordinary, the defense fails if the debtor's actions are unordinary. <u>In re Taubman</u>, 160 B.R. 964, 991 (Bankr. S.D. Ohio 1993). Ordinariness is judged by comparing the challenged transaction to others both among the same parties and more broadly within their respective industries. <u>See</u> <u>In re U.S. Interactive, Inc.</u>, 321 B.R. 388, 392 (Bankr. D. Del. 2005).

There is no dispute here that Image Masters' mortgage payments were ordinary on Defendants' side; the disagreement is about whether they were ordinary on Image Masters' side. Several courts have held that payouts to investors in a Ponzi scheme are not "ordinary" on the schemer's side because a Ponzi scheme has no "economic substance or profit potential" and its payouts are not "derived from any profit from [the scheme's] investments." <u>In re Bennett Funding Grp., Inc.</u>, 253 B.R. 316, 323 (Bankr. N.D.N.Y. 2000); <u>In re Hedged-Invs. Assocs., Inc.</u>, 48 F.3d 470, 476 (10th Cir. 1995). The objecting Defendants accept that rule, and only argue that it does not apply to the payments they received. (ECF No. 414 in 09-ap-2092 at 18.)

The homeowners were investors in Image Masters' Ponzi scheme, as Image Masters promised to pay their mortgages in part with proceeds from "investments," which turned out to consist of funds taken from other investors. Thus, Image Masters incurred its obligations to the homeowners to induce them to enter a Ponzi scheme, and its payments to Defendants represented, in part, payouts from that scheme. These facts raise an inference sufficient to defeat summary judgment on Defendants' ordinary course of business defense.

Defendants raise various objections to this line of reasoning, but all are based on a misunderstanding of which activities count when determining whether a payment is ordinary. Principally, Defendants argue they were not investors in the Ponzi scheme, so the un-ordinariness of the scheme shouldn't count against them. They point out that even if Image Masters was running a Ponzi scheme, it could still engage in other ordinary activities, and sending mortgage payments was ordinary. Defendants also ask me to overlook that those payments contained Ponzi scheme payouts to the homeowners, because, in their view, only Image Masters' relationship to the transferees—i.e., Defendants—is relevant. For support, Defendants point out that the definition of the ordinary course of business defense omits the phrase "for the benefit of a creditor" that appears elsewhere in the definition of a preference, suggesting that the debtor's relationship with its creditor is unimportant in deciding whether a payment is ordinary.

Ultimately, these arguments all stumble on the fact that, in defining the ordinary course of business defense, the Bankruptcy Code directs courts to examine whether the "debt incurred by the debtor" (as opposed to "to the transferee") was created and satisfied in the ordinary course of business. 11 U.S.C. § 547(c)(2) (emphasis added). Here, the debts incurred by the debtor—Image Masters—ran to the homeowners, not Defendants. Image Masters had the obligation to pay the homeowners' mortgages, in part with proceeds from the Ponzi scheme. Thus, Image Masters'

relationship with the homeowners cannot be ignored in deciding whether its payments were ordinary. Because Image Masters incurred its debts to induce the homeowners to enter a Ponzi scheme, and satisfied them in part with Ponzi scheme proceeds, a factfinder could infer that those transactions were not ordinary on Image Masters' side, and the ordinary course of business defense therefore cannot be applied at the summary judgment stage.

For the same reason, Defendants' cited cases holding that a Ponzi scheme can make ordinary payments to "noninvestor-creditors" such as those providing "telephone services" are not analogous, as Defendants here were not any sort of creditors, and certainly not ordinary trade creditors such as those providing telephone services. See In re Hedged-Invs. Assocs., Inc., 48 F.3d 470, 476 (10th Cir. 1995). As explained above, the "creditors" who count for application of the ordinary course of business defense are the homeowners, who were investors in Image Masters' scheme.

For these reasons, Defendants' motion for summary judgment on the ordinary course of business defense will be denied.[20]

## 2.    Subsequent New Value

The subsequent new value defense allows an entity who received a preferential payment to offset its liability against money or other value it gave back to the debtor. 11 U.S.C. § 547(c)(4). Thus, for example, if a creditor receives a $10 preference, but then pays $3 back to the debtor, the

---

[20] Some statements in the Report and Recommendation could be read as granting summary judgment to the Trustee that none of Image Masters' payments were made in the ordinary course of business. (See, e.g., Revised R&R at 84, 88.) Since the Trustee did not move for summary judgment, there has been no briefing on whether the undisputed facts show that every single payment by Image Masters was unordinary on its side, and the procedures for granting summary judgment to a nonmovant have not been invoked. See Fed. R. Civ. P. 56(f)(1). Accordingly, to the extent the Bankruptcy Court impliedly recommended granting summary judgment that no payments were made in the ordinary course of business, that recommendation is overruled.

creditor will only be liable for $7 of that preference. This provision "is designed to treat fairly a creditor who has replenished the estate after having received a preference." In re New York City Shoes, Inc., 880 F.2d 679, 681 (3d Cir. 1989) (quotation marks omitted).

The Bankruptcy Court determined that when Image Masters sent a mortgage payment to a Defendant, and the corresponding homeowner then sent a payment to Image Masters, the homeowner's payment was new value and the Defendant should receive credit for it. Thus, for example, if Image Masters sent a $500 mortgage payment to Citi, and Citi's borrower subsequently sent a $300 payment to Image Masters, Citi's preference liability would be reduced to $200. Presently, there is no dispute that the homeowners' payments to Image Masters were "new value," and the Trustee's only objection is that Defendants are not entitled to credit from payments not made by them, either in general or as a special rule for Ponzi schemes.

The relevant statutory language is that "[t]he trustee may not avoid under this section a transfer … to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor [subject to certain conditions]. 11 U.S.C. § 547(c)(4) (emphasis added). The Bankruptcy Court reasoned that when Image Masters sent a mortgage payment, it was "for the benefit" of the homeowner, who was Image Masters' "creditor." Thus, when "such creditor"—i.e., the homeowner—subsequently paid Image Masters, that was new value to the debtor and fit within the statutory language. See In re LGI Energy Sols., Inc., 746 F.3d 350, 356 (8th Cir. 2014) (applying the subsequent new value defense in an analogous situation).

The Trustee's objection, as best I understand it, is that while the Bankruptcy Code specifies who subsequent new value may come from, it does not say who receives credit for it. Thus, the Trustee reasons, courts need to invent a rule to fill that silence. Based largely on policy, the Trustee

advocates a rule under which only the person who sent the new value receives credit, at least where a Ponzi scheme is involved.

The problem with the Trustee's argument is that the statute does say who receives credit. Specifically, it says the trustee "may not avoid" a preference to the extent of new value, and, if a transfer is not "avoided," it may not be recovered from any of the entities described in § 550(a), including the transferee. The inescapable consequence is that the transferee receives credit when the creditor gives new value. "When statutory language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." In re Friedman's Inc., 738 F.3d 547, 553 (3d Cir. 2013) (quotation marks omitted). The language here is plain, and thus the Trustee's policy arguments do not overcome it. Those policy arguments are also not as clear-cut as the Trustee advocates, given that failing to credit new value can be unfair to creditors who remain on the hook for avoided payments. LGI Energy, 746 F.3d at 354. "[I]t is not [courts'] role to second guess how Congress has balanced … competing policies in … the [Bankruptcy] Code." Friedman's, 738 F.3d at 558.

For these reasons, summary judgment will be granted to Defendants on the subsequent new value defense to the extent recommended by the Bankruptcy Court.

### E.      Securities Safe Harbor

The GSEs (Fannie Mae and Freddie Mac) sought summary judgment on the ground that payments to them fell into a safe harbor for payments made in connection with securities contracts. The Bankruptcy Court recommended denying summary judgment on that ground, and I agree.

As an exception to a bankruptcy trustee's avoiding powers, the Code provides that "the trustee may not avoid," among other things, "a transfer that … [is] made by or to (or for the benefit of) a … financial institution … in connection with a securities contract," subject to certain

requirements not at issue here. 11 U.S.C. § 546(e). The GSEs argue the payments they received are protected by this safe harbor because they are financial institutions and the payments they received were "in connection with" a securities contract.

Notably, the GSEs do not contend they received Image Masters' payments pursuant to a securities contract. Instead, their argument rests on how they handled Image Masters' payments after receiving them—by sending them to investors in "securitization trusts." In the GSEs' view, the documents setting up those trusts qualified as "securities contracts," and, thus, every payment they received was "in connection with" a securities contract since it was ultimately destined for the trusts.

The Bankruptcy Court rejected this line of reasoning based on the Supreme Court's decision in Merit Management Group, LP v. FTI Consulting, Inc., 583 U.S. 366 (2018), which addressed how the securities safe harbor applies to multi-step transactions—i.e. the debtor sends money to A, who sends it to B. In Merit Management, one business (Valley View) purchased stock in another (Bedford Downs) from existing shareholders, including Merit Management. The transaction was mediated by financial institutions who provided credit and held the stock and purchase price in escrow. See id. at 375-76. Valley View subsequently filed for bankruptcy, and the bankruptcy trustee sued Merit to recover the purchase price Valley View had paid for Merit's shares. Id. at 376. Merit defended on the ground that it received the money via the mediating financial institutions, and the payments to and from those institutions fell into the § 546(e) safe harbor. The Supreme Court disagreed, holding that for the safe harbor to apply, "the overarching transfer that the trustee seeks to avoid," not its component parts, is what matters. Id. at 378. There is "no reason to examine the relevance of component parts" in evaluating the requirements of the

statute. Id. at 382. Thus, on the facts of Merit Management, it did not matter whether the sub-transfers with the financial intermediaries fit the statutory definition.

Applied to the facts of this case, the Bankruptcy Court reasoned that the transfers the Trustee seeks to avoid are the transfers from Image Masters to the GSEs (via other Defendants), not whatever the GSEs did with the payments after they received them. Because no contention has been made that Image Masters' own payments had anything to do with securities contracts, the safe harbor does not apply.

In their objections, the GSEs accept that the relevant transfers are the ones to them, but argue that those transfers still count as "in connection with" the GSEs' securitization trusts, because that is where the funds ended up. Relying on pre-Merit cases, the GSEs insist that "in connection with" is broader than "pursuant to," such that all that is required is some link between the payment and contract. Since, in the GSEs' view, securitization trusts are important to the national mortgage economy, payments to the GSEs should count as "in connection with" any trusts the GSEs happen to set up, irrespective of the fact that Image Masters had no knowledge of the trusts and no intent to send payments to them.

I conclude that the GSEs' position is inconsistent with, and would essentially undo, Merit Management, by sweeping in transfers other than the one the Trustee seeks to avoid. I decline to infer that the Supreme Court intended something as futile as limiting the inquiry to the transfer at issue while sweeping in all other transfers through the phrase "in connection with." The GSEs do not cite any post-Merit cases supporting that expansive reading, which is significant given that Merit "limited the reach" of the securities safe harbor. In re Bernard L. Madoff Inv. Sec. LLC, 583 B.R. 829, 841 n.12 (Bankr. S.D.N.Y. 2018). Moreover, as the Trustee points out, counting post-

transfer activity would allow any transferee to avoid liability simply by taking the money and putting it in a securities contract of its own creation, as the GSEs did here.

The GSEs also bring up, for the first time, that the loan sales from the First-Level Defendants could also be characterized as securities contracts. As that argument was not raised before the Bankruptcy Court, it may not be raised now. In re Kumar, No. 15-cv-21159, 2016 WL 7178984, at *4 (S.D. Fla. Dec. 9, 2016). In any event, it, too, is inconsistent with Merit Management: the transfer from the First-Level Defendant to the GSEs is not the transfer the Trustee seeks to avoid; it is the "overarching" transfer from Image Masters to the GSEs. The "overarching" transfer is what must be considered, irrespective of whether intermediate entities in the chain could be characterized as mere conduits. See Merit Management, 583 U.S. at 377 (declining to analyze whether the intermediary had "dominion and control over the transferred property").

For these reasons, summary judgment will be denied to the GSEs on the securities safe harbor.

### F.    Other Issues

#### 1.    Initial and Subsequent Transferees

The Trustee objects that the Bankruptcy Court's recommendation is internally inconsistent in that it found the First-Level Defendants were not initial transferees (because they were conduits), but nevertheless granted the Second-Level Defendants a more favorable good faith defense available only to subsequent transferees. 11 U.S.C. § 550(b). As the Trustee points out, someone has to be the initial transferee; not every transferee can be subsequent. BNY and Park Granada (who never moved for the § 550(b) defense) do not respond to this objection, and the

GSEs' response addresses only whether they themselves were transferees, not whether the First-Level Defendants were transferees.

I agree with the Trustee that only subsequent transferees are entitled to the § 550(b) good faith defense, and this turns on whether the First-Level Defendants are initial transferees. Accordingly, the Second-Level Defendants are only entitled to a § 550(b) defense to the extent they are ultimately determined to be subsequent transferees.

### 2.    Good Faith as to Preference Claims

Subsequent transferees may defend against a preference claim on the ground that they took the preferential payment for value, in good faith, and without knowledge that it was a voidable preference. In re Grove Peacock Plaza, Ltd., 142 B.R. 506, 520 (Bankr. S.D. Fla. 1992).

Before the Bankruptcy Court, only the GSEs moved for summary judgment on good faith as to preference claims. The Trustee did not respond to that argument, instead addressing only whether the GSEs were entitled to the defense as to fraudulent transfer claims. (See ECF No. 358 in 09-ap-2092 at 35 ("A transferee is not automatically protected by the good faith defense merely because it claims to have had no actual knowledge that a fraud was being perpetrated." (emphasis added)); id. at 44 ("[A]n investigation **would have** revealed the fraud." (first emphasis in original, second emphasis added)).)

The Bankruptcy Court granted summary judgment to the GSEs, BNY, Park Granada, and Wells Fargo Bank on the good faith defense as to preference claims, but the Report and Recommendation does not set out an analysis separate from fraudulent transfer claims. The Trustee objects to this recommendation. No Defendant substantively responds to the Trustee's objection.

Because BNY, Park Granada, and Wells Fargo Bank never moved for summary judgment on good faith as to preference claims, and did not respond to the Trustee's objection, the record

contains no basis for granting them that defense. Accordingly, I will overrule the Bankruptcy Court's recommendation granting summary judgment on good faith as to preference claims as to these Defendants.

The GSEs did move for summary judgment on good faith as to preference claims, and the Trustee did not respond substantively to that argument before the Bankruptcy Court or in her present objections (except to point out that the GSEs might not be subsequent transferees). I will therefore adopt the Bankruptcy Court's recommendation granting summary judgment to the GSEs on good faith as to preference claims, but only to the extent the GSEs are ultimately determined to have been subsequent transferees.

## VII.   <u>CONCLUSION</u>

For the reasons set out above, the Bankruptcy Court's Report and Recommendation will be adopted in part and overruled in part. Defendants' motions for summary judgment will be granted in part and denied in part as set out above.

An appropriate order follows.